[Crim. No. 12822. In Bank. Apr. 30, 1969.]

In re RICHARD MARKS on Habeas Corpus.

Norman Herring, Philip M. Schwabacher, Henry J. Shames and Harold Benjamin for Petitioner.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Respondent.

MOSK, J.—This is an application for writ of habeas corpus on behalf of Richard Marks (hereinafter called petitioner), currently confined in the California Rehabilitation Center (hereinafter called CRC) under an order of commitment as a narcotics addict. (Welf. & Inst. Code, § 3051.)

We are called upon to resolve, in effect, a jurisdictional dispute between the State of California's narcotics addict

rehabilitation program and that of Synanon, a well-known private rehabilitation organization. The principal issue is whether the state may impose its antinarcotic testing requirements on those of its outpatients who are also residents of Synanon.

We pause at the outset to emphasize that we do not presume to judge the merits of either program; our task is limited to determining whether this petitioner is entitled to relief within the framework of existing statutory and constitutional law. Thus viewed, petitioner's claims are not sustainable and the writ of habeas corpus must be denied.

Petitioner was first committed to the CRC as a narcotics addict in May 1965, following a conviction for possession of heroin. In April 1966 the Narcotic Addict Evaluation Authority (hereinafter called NAEA) granted him outpatient status and released him to Parkway Center, a "halfway house" operated by the state.[1]

In July 1966 petitioner was given permission to leave Parkway Center and establish independent residence. Throughout this period he participated successfully in the Nalline testing program.[2] In September 1966, however, a urine test produced a positive reading of heavy morphine content. Petitioner had meanwhile left his approved residence, and was finally found

[1] Welfare and Institutions Code section 3153 authorizes the Director of Corrections to establish such halfway houses. Their function has been explained as follows: "Such centers offer temporary residential quarters for selected California Rehabilitation Center releasees. The centers provide an added measure of control and supervision, plus casework aid in job and home placement and group and individual counseling. These halfway houses also are used as "halfway-back" facilities. Outpatients who are having adjustment problems in the community may be placed in the centers for short periods. Such action may prevent their return to the California Rehabilitation Center. These programs are built around the mutual efforts of staff and residents to obtain gainful employment, establish a savings plan, assume financial obligations and responsibilities, maintain the premises, live within a reasonable structure of sensible hours, wholesome association and constructive recreation. The average stay is about sixty-seven days." (4 Cal. Narcotics Rehabilitation Advisory Council Ann. Rep. (1968) pp. 4-5.)

[2] Nalline is the trade name of nalorphine hydrochloride (N-allylnormorphine hydrochloride), a morphine derivative used to diagnose the presence of opiate drugs in a user's system. In administering a Nalline test a physician first measures the diameter of the pupils of the patient's eyes; he then injects a solution of 3 mg. of Nalline under the skin of the patient's arm; after a waiting period of 30 minutes, he again measures the diameter of the pupils. If they have constricted, the patient has not been using any of the drugs detectable by this method; if the pupils have dilated, he has been using such drugs; if the change in size is less than 0.25 mm., the test is equivocal. (See Cal. Dept. of Public Health, Recommended Procedure for Narcotic Use Testing of Probationers and Parolees (1961) *passim*.)

by his field agent at the house of a fellow outpatient. He was discovered to have heroin in his pockets, and admitted that he had begun to use narcotics again. As a result of this arrest petitioner was convicted a second time of possession of heroin, and on January 17, 1967, was again committed to the CRC.

The NAEA thereupon suspended petitioner's prior outpatient status on the ground of multiple violations of the conditions of his release: i.e., unauthorized change of residence, illegal use of narcotics, and conviction of the crime of possession. It was decided, however, to retain petitioner in the program for a further attempt at rehabilitation. On September 8, 1967, petitioner was again released on outpatient status. As he was no longer deemed suitable for Parkway Center, he took up an approved independent residence. For some two months thereafter he showed cooperation and stability, and participated in the Nalline testing program.

In December 1967, Carl P. Doty, petitioner's field agent, was unable to locate him at his residence or place of work. On January 5, 1968, petitioner phoned Doty, told him he had moved in with his father-in-law, and said he would report to Doty's office to discuss the change of residence. He did not appear, however, until February 5, 1968, at which time he admitted he had been using narcotics since the previous December. He was temporarily placed in a Salvation Army halfway house, and two days later the NAEA suspended his outpatient status and classified him as a "releasee at large." On February 15, 1968, petitioner left the halfway house without permission, stating he would contact his field agent within the week. He did not do so, and nothing was heard from him until Doty received a letter from Synanon on March 14, 1968, advising that petitioner had been accepted as a resident of that organization's facility in Santa Monica.

Doty visited petitioner at his Synanon residence in March and May, and reported that he seemed to be "stabilizing" and had become "quite involved" in the Synanon program. On May 20, 1968, Doty recommended that petitioner be reinstated as an outpatient. The NAEA deferred its decision, and petitioner was instructed to report for a Nalline test on June 6, 1968. He complied, and the results were negative. The Authority formally restored petitioner to outpatient status as of the following day, and he returned to Synanon.

On June 12, 1968, Doty instructed petitioner to report for another Nalline test. This time petitioner refused, stating that he would no longer submit to any form of antinarcotic testing,

whether by Nalline, urinalysis, or physical inspection for needle marks, and whether administered by a field agent or at the Central Testing Center.[3]

Doty reported this refusal to the NAEA, and charged petitioner with breach of the condition of his release requiring him to participate in the testing program. (*Post*, fn. 17.) In so doing, however, Doty expressed the opinion that petitioner was experiencing a "positive response" to the Synanon program and was making a satisfactory overall adjustment, and that petitioner's participation in Synanon "would appear to be in [his] as well as the community's best interests." Doty therefore recommended that petitioner be continued in out-

[3]It is unquestioned that petitioner's refusal was motivated by his adoption of the principles of Synanon on the issue of antinarcotic testing. For a better understanding of those principles, we quote the following two paragraphs of the application for habeas corpus:

"Applicant was then residing at Synanon where any resort to narcotics or chemicals is not only strictly forbidden, but where resort to any procedures evocative of narcotic addiction are rigorously sought to be eliminated. The Nalline test is a test by which an opium derivative is injected under the skin by hypodermic needle. A Nalline test administering an opium derivative to an addict is a use of narcotics which is contrary to the best interests of a former addict and which is injurious to a person previously addicted. The use of a hypodermic needle to inject the opium derivative for the test is itself evocative of the very narcotic 'shooting' procedures which the California statute purportedly seeks to prevent. The Nalline test was refused by Marks.

"Urinalysis was also refused by Marks because, as a chemical test, it was completely destructive of Synanon principles to which Marks subscribed. The rules of Synanon do not permit mechanical or chemical tests for narcotic use and do not permit a person to remain a resident of Synanon who submits to any mechanical or chemical test for narcotic use. Synanon relies instead on the fact that drug use must peremptorily cease for residents. Synanon is based upon a value system of complete honesty, truth and trust. Such value system enables a resident to remain drug-free. Synanon recognizes that there is no magic 'cure' for drug addiction, but that an individual who can be ruthlessly honest and truthful has made the first real step towards recovery from addiction. The value system begins with each resident understanding he is solely responsible to himself for having used drugs in the past, he is solely responsible to himself to cease using narcotics immediately, and while a resident at Synanon, he is personally responsible to himself and to and for his fellow residents to see that he and they continue to remain drug-free. Accordingly, the principles of truth and honesty demand that each resident expose himself if he uses drugs and help other residents as well by exposing them if he is aware they use drugs. Such a responsibility (which is the very basis of the new value system) cannot be subverted by reliance on outer mechanical or chemical tests. If an outer mechanical or chemical test, rather than an inner value directed test, is used, the entire program will and must fail. Any mechanical or chemical test demeans the resident, retards his chances of recovery, destroys the system of honesty, truth and trust upon which Synanon is based, and dilutes and subverts the burden of personal responsibility the resident must bear to himself and to others to begin a new life by ceasing to use narcotics and seeing to it that he and his fellow residents remain free from narcotics."

patient status. On the other hand, William T. Byrnes, regional administrator of the Narcotic Addict Outpatient Program, reviewed the case and took the position that "This man's manipulative conduct in getting into Synanon and his individual outpatient adjustments aside from any merit or lack of merit possessed by Synanon as a treatment agency are sufficient to warrant return."

The matter was heard by the NAEA on June 20, 1968. After considering the various reports on file, the Authority found that petitioner had violated the condition of his release relating to mandatory antinarcotic testing, and unanimously concluded that his outpatient status should be again suspended and he should be returned to the CRC "for the best interests of the person and society," as prescribed by Welfare and Institutions Code section 3152. On June 26, 1968, petitioner was removed from Synanon and taken to the main CRC facility at Corona, where he is now confined.

■ Welfare and Institutions Code section 3151 provides in relevant part that, after an initial six-month period of observation and treatment, whenever a person committed to the CRC "has recovered from his addiction . . . to such an extent that, in the opinion of the Director of Corrections, release in an outpatient status is warranted," the director shall certify such fact to the NAEA; and that the NAEA may thereupon "release such person in an outpatient status subject to all rules and regulations adopted by the authority, and subject to all conditions imposed by the authority, whether of general applicability or restricted to the particular person released in outpatient status, and subject to being retaken and returned to inpatient status as prescribed in such rules, regulations, or conditions."

Welfare and Institutions Code section 3152 implements section 3151 by providing that "The rules for persons in outpatient status shall include but not be limited to close supervision of the person after release from the facility, periodic and surprise testing for narcotic use, counseling and return to inpatient status at the California Rehabilitation Center or its branches at the discretion of the authority, if from the reports of agents of the Department of Corrections or other information including reports of law enforcement officers as to the conduct of the person, the authority concludes that it is for the best interests of the person and society that this be done."

As appears from the decision of the NAEA in the case at

bar, that agency construes section 3152 to mean that anti-narcotic testing is mandatory for all persons in outpatient status under the CRC program. Petitioner insists, however, that the statute does not give the NAEA the power to require him to submit to such testing "without probable cause." The contention is that testing is not mandatory but discretionary, and that an exercise of the Authority's discretion in this respect must be predicated on specific facts showing a need for such controls in his individual case. In support of this position, petitioner selectively reads the statute to provide for "periodic and surprise testing . . . at the discretion of the authority, if from the reports [of correctional personnel] as to the conduct of the person, the authority concludes that it is for the best interests of the person and society that this be done."

Section 3152 will not reasonably bear the proposed construction. To begin with, antinarcotic testing of persons on outpatient status—particularly the "surprise" testing program—is designed not simply to detect past use of illegal drugs but also to deter their future use. (Cal. Dept. of Justice, A Report on the Synthetic Opiate Anti-Narcotic Testing Program (1961) pp. 8, 14.) The latter purpose would be totally frustrated if an outpatient could be required to test only after his "conduct" had been observed by correctional personnel and a "report" had been filed which charged, for example, that he had probably reverted to narcotics use. Moreover, if petitioner's construction were adopted the statute would likewise require reports as to an outpatient's conduct before he could be given "close supervision" or "counseling." Yet the Legislature elsewhere made clear its intent that all outpatients be kept under such supervision until they can safely be discharged.[4] To effectuate this intent the Legislature used the mandatory word "shall" in prescribing certain outpatient rules in section 3152; more specifically, by declaring that the outpatient rules shall "include but not be limited to" the listed matters, the Legislature distinguished between those rules which are mandatory in all cases—includ-

---

[4]Welfare and Institutions Code section 3000 declares in relevant part that "It is the further intent of the Legislature that persons committed to this program who show signs of progress after an initial or subsequent periods of treatment and observation be given reasonable opportunities to demonstrate ability to abstain from the use of narcotics *under close supervision in outpatient status* outside of the rehabilitation center. . . ." (Italics added.)

ing "periodic and surprise testing"—and those which may be adopted by the NAEA as experience dictates.[5]

It is true that after enumerating the mandatory outpatient rules, section 3152 concludes with a reference to "the discretion of the authority." But the phrase must be read in context. Considerations both of syntax and of legislative intent lead us to hold that the "discretionary" clause qualifies only the immediately preceding language of the statute, i.e., "return to inpatient status at the California Rehabilitation Center or its branches." When so read, the qualification is appropriate: an outpatient's violation of the conditions of his release may well be accompanied by mitigating circumstances or be so minor or technical in nature that an automatic return to confinement would serve no purpose and indeed could be counterproductive to the effort to rehabilitate him. Thus while the Legislature described certain mandatory conditions of release in section 3152, it properly deferred to the expertise of the NAEA on the question whether in any given case the return of an outpatient for violating those or other conditions would be "for the best interests of the person and society."[6]

 Turning to the latter issue, petitioner contends that the NAEA abused its discretion by suspending his outpatient status on the sole ground of his refusal to test. As will appear, the point is not well taken.

Petitioner asserts that the NAEA acted without having received any "reports" that he was "conducting himself improperly on release status." But section 3152 does not require that such reports reveal any particular misdeed by the outpatient; the statute is satisfied if the reports convey information from which the Authority may reasonably conclude

---

[5] A similar distinction has been drawn by the Legislature in the criminal law, between conditions of parole which are mandatory in all cases (Pen. Code, §§ 3053, 3053.5) and those which the Adult Authority "may deem proper" to impose (Pen. Code, § 3053).

[6] This pattern appears elsewhere in the statutory scheme. On the related topic of whether a defendant should be accepted for treatment in the first place, the Legislature prescribed certain general standards of eligibility (Welf. & Inst. Code, §§ 3051, 3052) but vested in the superintendent of the CRC, as delegate of the Director of Corrections, the authority to determine in each particular case whether the defendant is "because of excessive criminality or for other relevant reason, not a fit subject" for the rehabilitation program (Welf. & Inst. Code, § 3053). Thus "whether or not any given defendant can be treated with success is a fact which, in the last analysis, must be determined not by judges but by people trained in that field and actually engaged in the treatment process. Hence, out of practical necessity, the statute leaves to the professional experts the final decision on whether or not treatment should be begun or be continued." (*People* v. *Marquez* (1966) 245 Cal.App.2d 253, 256-257 [53 Cal.Rptr. 854].)

that return to the CRC would be in the best interests of the person and society. In the present case, as we have seen, Field Agent Doty did make a report to the NAEA, disclosing that petitioner refused to submit to further antinarcotic testing of whatever form and wherever administered.

In appraising petitioner's charge of abuse of discretion, it bears emphasizing that the Authority was not faced with an isolated instance of an outpatient inadvertently missing one or two tests; in such a situation, there could well be legitimate conflict on the question of what "the best interests of the person and society" require. Here, by contrast, petitioner has deliberately rejected the entire testing program. Yet this court has recognized the importance of such testing in any realistic, long-term effort to rehabilitate narcotics addicts. In *In re Trummer* (1964) 60 Cal.2d 658, 661 [36 Cal.Rptr. 281, 388 P.2d 177], we observed that "Experience with past programs of this nature has shown that a lack of followup supervision results in a high rate of relapse. [Citations.] The present 'parole' (outpatient) system is designed to overcome this defect by providing the necessary followup through counseling, *testing for narcotic use,* and immediate return for further treatment if a relapse should occur." (Italics added.) (See also *In re De La O* (1963) 59 Cal.2d 128, 144-145 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705].) *In re Cruz* (1965) 62 Cal.2d 307, 314 [42 Cal.Rptr. 220, 398 P.2d 412], stressed, moreover, that "if the program is to have any hope of long-term success it must remain compulsory. . . ." The Legislature provided for antinarcotic testing as part of this "followup supervision" of all outpatients, and made it compulsory. In these circumstances we cannot say that the NAEA acted arbitrarily when it ordered the return to the CRC of an outpatient who flatly refused to participate in such an essential aspect of the program.

Petitioner next urges that section 3152 does not specify the particular method of antinarcotic testing it requires; that "The Synanon life style, which demands continuous confrontation with one's peers, and continuous adherence to truth and honesty, is in fact a continuous and ongoing test" within the meaning of section 3152; and that the failure of the NAEA to investigate residence at Synanon as a substitute for chemical or mechanical testing was a further abuse of discretion.

Even if we grant petitioner's premise, his conclusions do not follow. Section 3152 speaks of "periodic and surprise test-

ing for narcotic use"; it does not, it is true, specify Nalline or urinalysis. But this does not mean that an outpatient is free to prescribe the method of testing to which he chooses to submit. Two years before the CRC program became law the Legislature enacted Health and Safety Code section 11728, which declares that "The rehabilitation of narcotic addicts and the prevention of continued addiction to narcotics is a matter of statewide concern. It is the policy of the State to encourage each county and city and county to make use of synthetic opiate anti-narcotics in action and other testing procedures to determine narcotic addiction or the absence thereof, and to foster research in means of detecting the existence of narcotic addiction and in medical methods and procedures for that purpose." Then as now, the most common of the "synthetic opiate anti-narcotics in action" was Nalline (see Cal. Dept. of Justice, A Report on the Synthetic Opiate Anti-Narcotic Testing Program (1961) p. 9 et seq.), and the courts have so construed this reference (e.g., *People* v. *Williams* (1958) 164 Cal.App.2d Supp. 858, 862 [331 P.2d 251] [identical language of Health & Saf. Code, § 11722, enacted in 1957]).

It is also true that section 11728 envisages "other testing procedures" than Nalline. But the context indicates that research into, development of, and the decision to use any such "medical methods" are intended to be matters of expertise. In the CRC statutes, the Legislature specifically declared that "Determinations of progress of persons committed to the program should be based upon criteria to be established by the Director of Corrections with the advice of clinically trained and experienced personnel." (Welf. & Inst. Code, § 3000.) The director's delegate with respect to the outpatient program is the NAEA, which is empowered by section 3151 to prescribe the appropriate rules and conditions of release. We conclude that the Legislature has vested in the Authority the discretion to determine, inter alia, the methods of testing required by section 3152. No abuse of that discretion is shown here, inasmuch as petitioner does not deny that Nalline and urinalysis are medically accepted, widely used methods of antinarcotic testing.[7]

---

[7]This is not to say, of course, that the concept of administering Nalline or other diagnostic drugs for the purpose of such testing is wholly free of controversy. (Compare 4 Cal. Narcotics Rehabilitation Advisory Council Ann. Rep. (1968) pp. 6-7, with Comment, *Antinarcotic Testing in California: Of Substantive Due Process* (1968) 56 Cal.L.Rev. 37, and Drugs in the Tenderloin (San Francisco Economic Opportunity Council (1967) pp. 34-35.) We intimate no view on the matter at this time.

By contrast, petitioner's construction of the statute to include Synanon residence as a "test" within the meaning of section 3152 is untenable. It would in effect read out of the statute the requirement that antinarcotic testing be both "periodic and surprise." That language strongly implies the use of distinct, individual tests of the kind administered by the NAEA; but whatever else it may mean, it cannot reasonably be taken to refer to the *continuous* condition of being in a given place, no matter how "intimate" or "intense" the experience. Petitioner replies that the statute can be satisfied in this regard by "periodic and surprise visits" to Synanon by his field agent; such visits would doubtless provide the agent with opportunities to observe petitioner in the Synanon setting, but in prescribing "testing" the Legislature clearly intended more than mere observation.

Nor was it an abuse of discretion for the NAEA to decline petitioner's invitation that it investigate Synanon's facilities and methods of operation. The Synanon "life style" has received wide publicity (see, e.g., references to books, articles, and films listed in Appendix to *In re Faucette* (1967) 253 Cal.App.2d 338, 347 [61 Cal.Rptr. 97]), and the Authority, composed as it is of specialists in the field of narcotics addict rehabilitation, was fully cognizant of its theory and practice. In particular, the Authority well knew Synanon's attitude on the issue of antinarcotic testing.[8] Yet this was the sole issue on which the Authority acted in the case at bar: it suspended petitioner's outpatient status because of his refusal to take further tests, not because of any particular condition of Synanon life.[9]

---

[8] Thus Victor H. Vogel, M.D., chairman of the NAEA since 1963, avers in a declaration appended to the return that prior to suspending petitioner's outpatient status "the Authority was aware of the philosophy of life at Synanon described in the aforenoted declarations [by Synanon officials, summarized in part in fn. 3, *ante*]. The Authority, however, does not consider life at Synanon to be an adequate and sufficient test for the detection of narcotic use. Testing by any 'mechanical' or chemical means for relapse to drug use is forbidden the residents at Synanon and their determinations that their residents are not relapsing to drug use are, in essence, personal, subjective evaluations."

[9] In his declaration (*ante,* fn. 8) Dr. Vogel states that "The Authority did not order the return of Marks . . . to the California Rehabilitation Center because [he was] living at and wished to reside at Synanon but because [he] refused and continued to refuse to submit to urinalysis or Nalline testing. The Authority has not yet formally considered whether its outpatients should or should not be allowed to use Synanon as a living residence." The actual ground of suspension is shown by the fact that after petitioner took a Nalline test on June 6, 1968, the Authority restored him to outpatient status although knowing he would resume his residence at Synanon.

Petitioner's reliance on *In re Faucette* (1967) *supra,* 253 Cal.App.2d 338, is misplaced. In that case, the Adult Authority was directed to conduct an investigation of Synanon before determining it to be an unacceptable place of residence for a criminal parolee under its jurisdiction. The heart of the decision is the trial court's ruling that " '[i]f after full consideration of the advantages, as compared to possible disadvantages, the Adult Authority would conclude that Synanon House is a desirable place for a former drug addict, and would provide for him a reasonable opportunity to receive supportive help, such as is available at Synanon House, the Adult Authority might well, in its sound discretion, find that sufficient other safeguards and methods of drug addiction detection are available and present at Synanon House to warrant their *granting a waiver of the nalline test* for such resident during the period of his residence [therein].' " (Italics added; *id.* at p. 345.) ▆ Such a waiver of Nalline testing is within the power of the Adult Authority, for the relevant statute vests in that body the discretion whether or not to require testing as a condition of parole. (Health & Saf. Code, § 11722, subd. (c) ; see also subd. (a), vesting similar discretion in the trial courts with respect to conditions of probation.) As we have seen, the Legislature has made testing mandatory for outpatients in the CRC program, and the NAEA thus has no discretion to waive the requirement. No amount of "investigation" by the Authority can change this fundamental difference in the statutes.

Petitioner's remaining contentions on this point require less discussion. He emphasizes that a number of parolees and probationers are currently residing at Synanon, none of whom is required by the Adult Authority or the trial courts to submit to testing; as just noted, however, the NAEA does not have comparable power to waive testing under existing statutes. ▆ Petitioner also points to the fact that even after his refusal to test, Field Agent Doty reported that his continued participation in the Synanon program would be in the best interests of both petitioner and the community; but as Doty explained at the time to petitioner and to Synanon representatives, in so stating he was simply expressing a personal opinion that was not binding on the Authority and was necessarily subject to the terms of the statute. ▆ Finally, petitioner stresses that he was abstaining from narcotics use while a Synanon resident, as shown by the negative Nalline test on June 6, 1968; but this argument presupposes that an

individual must actually resume taking illegal drugs before his outpatient status can be suspended. To so hold would be an unacceptable construction of section 3152. As we explained in the case of *In re Trummer* (1964) *supra,* 60 Cal.2d 658, 661, "the purpose of the [CRC] program is not only to treat and 'cure' addicts, it is also to rehabilitate them. . . . Thus, although petitioner currently may give every appearance of being 'cured' of his addiction, it is within the constitutional power of the Legislature to require that a person once committed as a narcotics addict remain under supervision for a period sufficient to give reasonable assurance against relapse."

Petitioner next complains that the procedure by which the NAEA suspended his outpatient status deprived him of due process of law. In particular, he contends that he was entitled to (1) notice of the charges upon which the Authority proposed to suspend his outpatient status, (2) opportunity to be heard in rebuttal of those charges, (3) assistance of counsel at such a hearing, and (4) written findings and conclusions to support the action taken by the Authority.

Petitioner misconceives the nature of these proceedings. As originally enacted in 1961, the first predecessor to Welfare and Institutions Code section 3151 (former Pen. Code, § 6403; Stats. 1961, ch. 850, p. 2223) vested in the Adult Authority the administration of the "parole" (i.e., conditional release) portion of the CRC program. In *In re De La O* (1963) *supra,* 59 Cal.2d 128, 144, we observed that the statute "provides *(and reasonably so)* that persons paroled thereunder are 'subject to being retaken and reconfined in the same manner as other parolees are retaken'" (italics added). In the 1963 revision of the narcotics addict commitment law all references in the original statute to "parole" were changed to "outpatient status," and the responsibility for administering the release program was transferred from the Adult Authority to the newly created NAEA. (Former Pen. Code, § 6516; Stats. 1963, ch. 1706, p. 3356.) But these changes were largely pro forma, designed to eliminate some of the external "indicia of criminality" in the original statute that had been noted in *De La O.* When in 1965 the statute was recodified into the Welfare and Institutions Code for the same reason, the 1963 language dealing with release and retaking of outpatients was transferred intact to the present section 3151. Construing that language, it has recently been noted that "although the California Rehabilitation Center outpatient is not officially called

a parolee, the manner and methods of release and the continuing control and supervision of a parolee from prison and an outpatient from California Rehabilitation Center' are strikingly similar," particularly "with reference to the respective return to confinement of parole violators and California Rehabilitation Center outpatient violators." (49 Ops.Cal. Atty.Gen. 11 (1967).)

As this court has repeatedly recognized, "it is settled that the Adult Authority may suspend, cancel, or revoke a parole for good cause *without notice or hearing. . . .*" (Italics added.) (*In re Gomez* (1966) 64 Cal.2d 591, 594 [51 Cal.Rptr. 97, 414 P.2d 33], and cases cited.) Petitioner seeks to distinguish this rule on the ground that it is based on affirmative statutory authorization (Pen. Code, § 3060), while the narcotics addict commitment law is silent on the point. Equally silent in this respect, however, is the statute granting trial courts the analogous power to revoke probation (Pen. Code, § 1203.2), yet we have squarely held that "there is neither a constitutional nor a statutory right to notice and hearing preceding revocation of probation." (*In re Davis* (1951) 37 Cal.2d 872, 873 [236 P.2d 579].) And we have applied the same rule to the exercise of the Adult Authority's power to determine and redetermine sentences. (*In re McLain* (1960) 55 Cal.2d 78, 84-85 [9 Cal.Rptr. 824, 357 P.2d 1080].)

With regard to such special proceedings, in short, there is no statutory right to notice and hearing unless it is specifically granted by the Legislature. Thus had the statute provided for notice and hearing in connection with the suspension of outpatient status by the NAEA,[10] we would have strictly enforced such a requirement (see *In re Raner* (1963) 59 Cal.2d 635, 639, 641-643 [30 Cal.Rptr. 814, 381 P.2d 638]); but in the absence of an express provision to this effect, "It is not . . . for the courts to revise such a 'creature of statute' " as the narcotics addict commitment program (*People v. Victor* (1965) 62 Cal.2d 280, 295 [42 Cal.Rptr. 199, 398 P.2d 391]).

Lacking a statutory mandate for notice and hearing, petitioner invokes the due process clause of the Fourteenth Amendment. But as we observed in *Davis* (37 Cal.2d at p.

---

[10]For example, Congress so provided in the federal Narcotic Addict Rehabilitation Act of 1966: "Upon return to custody, the offender shall be given an opportunity to appear before the Board [of Parole], a member thereof, or an examiner designated by the Board, after which the Board may revoke the order of conditional release." (18 U.S.C. § 4255.)

873), "The federal Constitution does not give such a right. (*Escoe* v. *Zerbst* (1935) 295 U.S. 490, 492 [55 S.Ct. 818, 79 L.Ed. 1566].)" In *Escoe* the United States Supreme Court rejected a federal prisoner's contention that his right to a hearing upon revocation of probation "has a basis in the Constitution, apart from any statute" (*ibid.*), and recognized "the power of the lawmakers to dispense with notice or a hearing as part of the procedure [of revocation]" (*id.* at p. 493 [79 L.Ed. at p. 1569]).[11] This is not to say, of course, that the narcotics addict is bereft of due process, and we have firmly guaranteed him that fundamental protection. (*In re Raner* (1963) *supra*, 59 Cal.2d 635; *In re Johnson* (1963) 59 Cal.2d 644 [30 Cal.Rptr. 819, 381 P.2d 643]; *In re Jones* (1964) 61 Cal.2d 325 [38 Cal.Rptr. 509, 392 P.2d 269].) In the context of revocation of parole and redetermination of sentence, however, we have explained that "The notice of a hearing was given and required to be given in the proceedings which resulted in the original conviction." (*In re McLain* (1960) *supra*, 55 Cal.2d 78, 85.) By parity of reasoning, the requirements of due process are satisfied in the case of the addict by the elaborate statutory safeguards circumscribing his original commitment, such as personal service of the petition and order for medical examination, arraignment on the petition, notice of time and place of hearing, right to counsel, right to subpoena and cross-examine witnesses, right to the attendance and testimony of examining physicians, and right to jury trial to review the issue of addiction. (Welf. & Inst. Code, §§ 3050-3108.) When at some later date the NAEA in its discretion grants such a person a conditional release, "its action, in the very nature of things, is tentative and may be changed for cause. Such procedure presents no federal question." (*In re McLain, supra*, at p. 85 of 55 Cal.2d.)

As a further ground of distinction, petitioner stresses that conviction is "criminal" and parole is a matter

---

[11]Although *Escoe* specifically dealt with probation, it has been construed to encompass other forms of conditional release. (*People* ex rel. *Harris* v. *Ragen* (N.D.Ill. 1949) 81 F.Supp. 608, 609, affd. (7th Cir. 1949) 177 F.2d 303, 304.) It is well established, for example, that due process does not require notice or hearing for parole revocation. (*Williams* v. *Dunbar* (9th Cir. 1967) 377 F.2d 505, 506, and cases cited.) The holding of *Mempa* v. *Rhay* (1967) 389 U.S. 128 [19 L.Ed.2d 336, 88 S.Ct. 254], i.e., that the imposition of sentence after revocation of probation is a critical stage of the proceedings requiring the appointment of counsel, is inapplicable to cases of termination of conditional release which involve no such sentencing. (*Eason* v. *Dickson* (9th Cir. 1968) 390 F.2d 585, 588, fn. 3; *Williams* v. *Patterson* (10th Cir. 1968) 389 F.2d 374, 375; *Rose* v. *Haskins* (6th Cir. 1968) 388 F.2d 91, 97.)

of "grace," while commitment is "civil" and outpatient release is a matter of "discretion." Little is gained by the use of such labels. Whether any particular rule of criminal practice should be applied in a narcotics addict commitment proceeding depends, rather, "upon consideration of the relationship of the policy underlying the rule to the proceeding." (*People* v. *Moore* (1968) 69 Cal.2d 674, 681 [72 Cal.Rptr. 800, 446 P.2d 800].) Two principal policies are served by the rule authorizing revocation of conditional release without notice and hearing. First, it permits the authorities to promptly return the releasee to custody, thus minimizing the danger that he will further relapse or will go into hiding. (See, e.g., *In re Davis* (1951) *supra,* 37 Cal.2d 872, 874-875.) Second, to hold such a hearing every time a releasee is suspended, for whatever cause, would impose an excessive burden on the machinery of the administration of justice, far outweighing any speculative benefit.[12]

Similar policies are vital to the operation of the narcotics addict commitment program. We have recognized that "the physical and psychological grip of narcotics addiction is so strong that at some point in the treatment process many addicts will tend to rebel and turn uncooperative, preferring in effect the known consolations they find in drug use to the unknown problems they fear having to face upon rehabilitation." (*In re Cruz* (1965) *supra,* 62 Cal.2d 307, 314). When such a person fails on outpatient status, his reversion to illegal narcotics proceeds swiftly.[13] Unless the rehabilitation authorities are empowered to act with equal swiftness to remove him from the contaminating environment and provide him with the necessary physiological and psychological support, the timetable of his recovery may be severely set back. It is for this reason that in *In re Trummer* (1964) *supra,* 60 Cal.2d 658, 661, we characterized this aspect of the outpatient

---

[12]Thus in *Williams* v. *Dunbar* (9th Cir. 1967) *supra,* 377 F.2d 505, 506, the court observed that "If the appellant's contentions were valid, the use by the states and the federal government of the beneficent practice of releasing prisoners from the confines of the prison to the custody and supervision of parole officers would be impracticable and would have to be abandoned. The release from the confines of the prison would become substantially equivalent to the discharge of the prisoner from his sentence, and if, as in the instant case, the parolee denied either the fact of the violation or the legal sufficiency of the act alleged to be a violation of his parole, the prison authorities would be required, in a hearing before a judge, with all the concomitants of a non-jury criminal trial, to justify their resumption of in-prison custody of their prisoner."

[13]In the case at bar, for example, petitioner reverted to the use of heroin on each of the two occasions that he left the supervision of his field agent.

program as the *"immediate* return for further treatment if a relapse should occur." (Italics added.)

Secondly, the practical difficulties entailed in giving every CRC releasee a full-dress hearing on suspension are even greater than in the case of Adult Authority parolees, for the proportion of persons affected is much higher. During the most recent period for which statistics are available (1967), 55.2 percent of the men and 54.8 percent of the women released on outpatient status were suspended again in the same year. (Cal. Dept. of Corrections, Summary Statistics: Civil Commitment Program for Narcotic Addicts (1967) pp. 71-72.)[14] These figures should be read in the light of the view of the CRC administrators that suspension and return of an outpatient, usually for a brief period,[15] does not denote ultimate failure, and should be considered rather as a step in the total process of rehabilitation. (E.g., Wood, *The Civil Narcotics Program: A Five Year Progress Report* (1967) 2 Lincoln L.Rev. 116, 125-126.) Indeed, the Legislature appears to have contemplated such a sequence, declaring its intent (Welf. & Inst. Code, § 3000) that outpatient status be granted to persons who show signs of progress "after an initial *or subsequent periods* of treatment and observation" (italics added). Yet in any program in which one out of every two persons conditionally released is likely to be brought back for further treatment several times before final discharge, it is obvious that to require a high degree of formality in processing each return would render the whole operation unworkable.[16]

---

[14]The absolute figures for all years of the CRC program are also noteworthy. At the end of 1966 the outpatient population was 1,509; during 1967, 2,740 additional persons were received in outpatient status, making a total of 4,249. In the course of the year 1967, however, 2,204 persons were suspended from outpatient status. (*Id.* at p. 60.)

[15]"A short-term return procedure also has been established (not to exceed sixty days). This is designed to provide brief intensive inpatient treatment in cases in which there has been an adjustment deterioration. Such timely intervention seeks to prevent long-term returns to inpatient status, and hence to avoid the high cost of such long-term control measures. It also permits the individual to preserve existing job and home resources." (4 Cal. Narcotics Rehabilitation Advisory Council Ann. Rep. (1968) p. 2.)

[16]Nor is there merit in petitioner's last ground of distinction, i.e., that Penal Code section 3056 specifically provides that "Prisoners on parole shall remain under the legal custody of the department [of Corrections]." Welfare and Institutions Code section 3051 declares that upon a finding of addiction the court "shall make an order committing such person to the custody of the Director of Corrections," and section 3151 provides that "The supervision of such persons while in an outpatient status shall be administered by the Department of Corrections."

Petitioner makes much of our language in *In re Gomez* (1966) *supra,* 64 Cal.2d 591, 594, fn. 1, in which we note and encourage the current practice of the Adult Authority of giving notice and hearing before revoking—as opposed to suspending—paroles. It is anomalous, he argues, that return to civil confinement is attended by less safeguards than return to prison. Yet there is a vast difference between procedures compelled by law and those adopted in practice by an agency in the proper exercise of discretion. There are also significant differences between the agencies here involved—the Adult Authority and the NAEA—with respect to their facilities and manpower, and the urgency with which each must act.

 Nevertheless, as appears from the portions of the record recited at the outset, the procedures actually followed by the NAEA in suspending petitioner's outpatient status and returning him to custody were not as summary as he now claims. He was given advance notice of the requirement that he submit to testing, and ample opportunities to do so. Formal charges were filed by his field agent and reviewed by the regional administrator, and written findings and conclusions were filed by the NAEA in support of its action. Petitioner well knew that his refusal to participate in the testing program was the sole cause of his suspension.[17] Moreover, on July 5, 1968, the NAEA granted him an informal hearing, in which the Authority's interpretation of the law was explained and petitioner personally reiterated his position; and on September 26, 1968, the Authority likewise heard at length from officers of Synanon and Synanon's attorney on behalf of this petitioner and others. The consideration thus accorded by the NAEA to the views of petitioner and his spokesman reflects the ''sense of fairness'' to which we referred in *Gomez.*

Finally, petitioner contends that Welfare and Institutions Code sections 3151 and 3152 are unconstitutional delegations of legislative authority because they provide no objective or

[17]Petitioner's conditions of release began by admonishing him that ''This release is granted to, and is accepted by you, subject to the following conditions and with the agreement that the Narcotic Addict Evaluation Authority has the power, at any time in case of your failure to abide by the conditions of release, to cause your detention and/or return to the California Rehabilitation Center.'' Condition No. 6 declared that ''By reason of your commitment to the California Rehabilitation Center, you are required by Welfare and Institutions Code, Section 3152 to participate in anti-narcotic testing. You shall participate in such program and agree to conform to the instructions of your Supervising Agent regarding your participation therein.'' Petitioner signed an agreement to abide by each of the conditions thus specified.

reasonable standards to guide the NAEA in exercising its powers to determine whether a person committed to the program should be released as an outpatient; to prescribe the conditions of that release, and to suspend outpatient status and order a return to custody.[18]

Petitioner's reading of the statute is unduly narrow. ''The standard of definiteness instantly relevant is that applicable where the Legislature delegates responsibility to a board or agency to carry out a legislatively declared policy. Such a standard need be sufficiently definite only to provide directives of conduct for the administrative body in exercising its delegated administrative or regulatory powers.'' (*Duskin v. State Board of Dry Cleaners* (1962) 58 Cal.2d 155, 160 [23 Cal.Rptr. 404, 373 P.2d 468], and cases cited.) Here, such ''directives of conduct'' are clearly inferable from the declared purpose of the statute. (*In re Petersen* (1958) 51 Cal.2d 177, 185-186 [331 P.2d 24, 77 A.L.R.2d 1291].)

Welfare and Institutions Code section 3000 sets forth the legislative policy underlying the entire program, i.e., that persons addicted to narcotics ''shall be treated for such condition and its underlying causes, and that such treatment shall be carried out for nonpunitive purposes not only for the protection of the addict . . . against himself, but also for the prevention of contamination of others and the protection of the public.'' The same section further declares, as quoted above, the policy in favor of giving all persons ''who show signs of progress . . . reasonable opportunities to demonstrate ability to abstain from the use of narcotics under close supervision in outpatient status. . . .'' It is necessarily implied in sections 3151 and 3152 that the NAEA will act in such a manner as to effectuate, rather than frustrate, the foregoing legislative policies: To this implication is added, in section 3152, the previously discussed mandatory conditions of release and the express ''standard'' that an outpatient will be returned to the CRC if the Authority concludes ''that it is for the best interests of the person and society that this be done.''

Taking these provisions together, it appears that the powers

---

[18]Petitioner also complains that the NAEA has never adopted the ''rules and regulations'' for release on outpatient status that are apparently contemplated by section 3151. The point is insignificant. The command of section 3152 as to what such rules ''shall include'' is in a sense self-executing; and the Authority has chosen to prescribe the details thereof by the other method mentioned in section 3152, i.e., the imposition of general and particular conditions of outpatient release.

of the NAEA to grant, regulate, and suspend outpatient status are to be exercised (1) upon an informed determination made in good faith (2) to promote the treatment and rehabilitation of the person committed as an addict (3) with due regard for the protection of the addict against himself and of the public in general and (4) in obedience to the several mandatory conditions prescribed. In the circumstances, such standards are sufficiently precise. Indeed, we have elsewhere recognized that "the Legislature may, in uncharted areas such as narcotic addict rehabilitation, experiment to a certain degree and within constitutional limits" (*In re Raner* (1963) *supra*, 59 Cal.2d 635, 637) ; it would be unwise, if not self-defeating, to insist that the Legislature impose detailed criteria of action on the very agency it created for the purpose of developing a body of expertise in this hitherto "uncharted" area.

In conclusion, we are impelled to observe that petitioner's difficulties are not so much with the actions of the NAEA as with the language of the controlling statutes. His appropriate remedy, therefore, is legislative rather than judicial. The Legislature is well aware of the Synanon program : Health and Safety Code section 11391, which prescribes the places in which addiction may be treated (e.g., state and county prisons and hospitals), was amended in 1961 by adding the caveat that "neither this section nor any other provision of this division shall be construed to prohibit the maintenance of a place in which persons seeking to recover from narcotic addiction reside and endeavor to aid one another and receive aid from others in recovering from such addiction, nor does this section or such division prohibit such aid, provided that no person is treated for addiction in such place by means of administering, furnishing, or prescribing of narcotics. The preceding sentence is declaratory of pre-existing law." (Stats. 1961, ch. 1075.) The Assembly Interim Committee on Criminal Procedure subsequently explained that the amendment "indicated that the State Legislature had no intention to prohibit private efforts at narcotics rehabilitation. . . . [S]pecifically recognizing the legality of 'places of aid' the Legislature attempted to disassociate the State from local efforts to close Synanon." (22 Assembly Interim Com. Report No. 3 (1963) p. 79.)[19]

---

[19]After studying the Synanon program in some detail, the committee concluded: "Recognizing the failure of standard treatment approaches to the narcotics addict, and the magnitude of California's narcotics prob-

Yet section 11391 was thus amended in the same session in which the Legislature enacted the first version of the CRC law (Stats. 1961, ch. 850), including the mandatory testing requirement discussed in this opinion. Cognizant of a potential conflict between the two programs, the Assembly Interim Committee on Criminal Procedure recommended in 1963 that "Any bill making addicts subject to involuntary commitment should contain a section exempting addicts who are residents of 'places of aid' as defined in Health and Safety Code Section 11391." (22 Assembly Interim Com. Report No. 3 (1963) p. 47.) To date, the Legislature has not seen fit to adopt the recommended exemption. (See Note, *Control and Treatment of Narcotic Addicts: Civil Commitment in California* (1969) 6 San Diego L.Rev. 35, 54-56.) This court has no alternative but to apply the civil commitment statutes as it finds them.

The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

---

lem, we urge that every possible approach to rehabilitation be explored. Government does not, and should not, have a monopoly in the field of narcotics rehabilitation. We welcome any effort that offers promise of some success in rehabilitating narcotic addicts. We believe that Synanon's program is one of the most promising yet developed in the United States. It deserves the helpful, nondirective interest of the people of California." (*Id.* at p. 81.)