[Crim. No. 15948. In Bank. Mar. 21, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM GLENN MYERS, Defendant and Appellant.

**COUNSEL**

Robert L. Fletcher, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Robert R. Granucci and Charles R. B. Kirk, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WRIGHT, C. J.**—William Glenn Myers appeals from a judgment upon jury convictions of illegal possession of marijuana (Health & Saf. Code, § 11530), illegal possession of amphetamines (Health & Saf. Code, § 11910), and illegal possession of a hypodermic needle and a hypodermic syringe (Bus. & Prof. Code, § 4143). Searches without a warrant of defendant's cabin and automobile produced evidence which led to the convictions. The searches were concededly unconstitutional if defendant was, at that time, entitled to Fourth Amendment protections.[1] The question is whether defendant's status as an outpatient following his commitment as a narcotic addict to the California Rehabilitation Center made the searches without a warrant valid. We conclude that it did not.

The facts of the case are essentially undisputed. Defendant was committed on April 18, 1966, to the California Rehabilitation Center at Corona as a narcotic addict following a narcotic conviction but before he was arraigned for judgment. (Welf. & Inst. Code, § 3051.) He was released on August 28, 1967, as an outpatient pursuant to Welfare and Institutions Code section 3151.[2] On July 17, 1969, defendant rented a cabin from Bernice Smith and moved in the next day. From that time until July 28,

---

[1]Reference hereinafter to Fourth Amendment rights are intended to include not only the right to be free from unreasonable searches and seizures as proscribed by the Fourth Amendment of the federal Constitution but also by article I, section 19, of the California Constitution.

[2]Welfare and Institutions Code section 3151 provides: "After an initial period of observation and treatment of six months, and subject to the rules and policies established by the Director of Corrections, whenever a person committed under Article 2 or Article 3 of this chapter has recovered from his addiction or imminent danger of addiction to such an extent that, in the opinion of the Director of Corrections, release in an outpatient status is warranted, the director shall certify such fact to the authority. If the director has not so certified within the preceding 12 months, . . . his case shall automatically be referred to the authority for consideration of the advisability of release in outpatient status. Upon any such certification by the director or such automatic certification, the authority may release such person in an outpatient status subject to all rules and regulations adopted by the authority, and subject to all conditions imposed by the authority, whether of general applicability or restricted to the particular person released in outpatient status, and subject to being retaken and returned to inpatient status as prescribed in such rules, regulations, or conditions. The supervision of such persons while in an outpatient status shall be administered by the Department of Corrections. Such persons are not subject to the provisions of Penal Code Section 2600. . . ."

Mrs. Smith observed defendant and at least 35 to 40 persons going to and from defendant's cabin in a "continuously [sic] stream." Sometimes defendant would leave several of his visitors in the cabin while he went out. Mrs. Smith also observed people leaving the cabin carrying objects. She relayed her observations to the Humboldt County Sheriff.

On July 28, 1969, sheriff's deputies communicated with Elmer Cox, the parole officer assigned to supervise defendant as an outpatient (see Welf. & Inst. Code, § 3151), and advised him that defendant was suspected of dealing in narcotics.[3] Cox, together with sheriff's deputies, went to defendant's cabin to talk to him and to search his cabin in order to determine whether he was involved in narcotics activity. Defendant was not home. At Cox' request Mrs. Smith unlocked the door; the officers entered and proceeded to make a thorough search of the cabin. In the bedroom a deputy sheriff found marijuana, marijuana seeds, amphetamines, a homemade hypodermic syringe and needle, and Dexamyl tablets (containing both amphetamines and barbiturates).

While the search was in progress defendant drove up in an automobile with two other persons. Cox went outside and took defendant into custody. Thereafter defendant was removed to the interior of the cabin where he was placed under arrest for the aforementioned violations. A search of the automobile disclosed a marijuana cigarette in a tobacco pouch on the visor.

A motion to vacate and set aside the information on the ground that the evidence was illegally seized (Pen. Code, § 995) was denied.

The question of whether a person who has the status of an outpatient under the rehabilitation program is entitled to Fourth Amendment protections was considered in *People* v. *Jasso* (1969) 2 Cal.App.3d 955 [82 Cal. Rptr. 229]. Jasso was an outpatient who had failed to report for narcotics testing and who had changed his residence without securing prior approval. A supervising agent received a call from a person who told him where Jasso lived. The agent, together with police officers, went to that location and took Jasso into custody outside his house. A search without a warrant of the interior of the house produced evidence which led to Jasso's conviction.

The court held that Jasso's status as an outpatient did not justify the search. It said: "The parole agent . . . acted upon the theory that an outpatient's status was completely identical to that of a parolee. This is not true. While there are criminal aspects to narcotics addiction proceedings

---

[3]The record does not reveal whether this suspicion (mentioned only in the preliminary hearing transcript) was based on anything more than the information Mrs. Smith had given the sheriff.

(*People* v. *Moore* (1968) 69 Cal.2d 674, 681-682 [72 Cal.Rptr. 800, 446 P.2d 800]), a commitment under section 3050 et seq. of the Welfare and Institutions Code is deemed nonpenal and civil in character. (*In re De La O* (1963) *supra*, 59 Cal.2d 128, 156 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705]; *In re Trummer* (1964) 60 Cal.2d 658 [36 Cal.Rptr. 281, 388 P.2d 177].) A parolee is a sentenced felon and in law is deemed 'civilly dead' for certain purposes under section 2600 of the Penal Code. [Citation.] The outpatient's civil rights have not been lost, except as curtailed by the conditions deemed necessary to supervise his cure. (*In re Trummer* (1964) *supra*, 60 Cal.2d 658, 661-662; *People* v. *Moore* (1968) *supra*, 69 Cal.2d 674; Welf. & Inst. Code, §§ 3151, 3152.) His status is more analogous to that of a defendant who has been placed on probation without imposition of a felony sentence. 'The probationer [whose guilt has been established by plea, finding, or verdict, but who has not been sentenced to prison] still retains his ordinary civil rights, unless the court has restricted them' (*People* v. *Banks* (1959) 53 Cal.2d 370, 386-387 [1 Cal.Rptr. 669, 348 P.2d 102]) as a condition of probation. (See *People* v. *Hernandez* (1964) 229 Cal.App.2d 143, 150 [40 Cal.Rptr. 100], cert. denied, 381 U.S. 953. . . .) A probationer enjoys the protection of the constitutional guarantees against unreasonable searches and seizures of his home (*Martin* v. *United States* (4th Cir. 1950) 183 F.2d 436, 439), absent some other legal basis for the search." (*People* v. *Jasso, supra*, 2 Cal.App.3d 955, 963-964, fn. omitted.) The *Jasso* court concluded that there was no other legal basis for the search as defendant had not waived his Fourth Amendment rights as a condition of release to outpatient status.

*Jasso*, then, analogizes outpatients to probationers who have not had sentence imposed nor waived their Fourth Amendment rights as a condition of probation (*People* v. *Mason* (1971) 5 Cal.3d 759 [97 Cal.Rptr. 302, 488 P.2d 630]). Other courts have analogized outpatients to parolees (cf. *Hacker* v. *Superior Court* (1968) 268 Cal.App.2d 387, 390 [73 Cal. Rptr. 907]) who can be subjected to a search without a warrant by parole officers (*In re Martinez* (1970) 1 Cal.3d 641, 647, fn. 6 [83 Cal.Rptr. 382, 463 P.2d 734]). ■ However, as an outpatient is neither a parolee nor a probationer, analogies with the status of such persons is an unsatisfactory approach in determining whether outpatients can be subjected to searches by reason of their status alone. Rather, we must look to the particular policy which the commitment program serves. In a similar situation we have said: "As a further ground of distinction, petitioner stresses that conviction is 'criminal' and parole is a matter of 'grace,' while commitment is 'civil' and outpatient release is a matter of 'discretion.' Little is gained by the use of such labels. ■ Whether any particular rule of

criminal practice should be applied in a narcotics addict commitment proceeding depends, rather, 'upon consideration of the relationship of the policy underlying the rule to the proceeding.' (*People* v. *Moore* (1968) 69 Cal.2d 674, 681 [72 Cal.Rptr. 800, 446 P.2d 800].)" (*In re Marks* (1969) 71 Cal.2d 31, 47-48 [77 Cal.Rptr. 1, 453 P.2d 441].)

The policy which underlies the whole of the commitment program is set forth in Welfare and Institutions Code section 3000: "It is the intent of the Legislature that persons addicted to narcotics, or who by reason of repeated use of narcotics are in imminent danger of becoming addicted, shall be *treated for such condition* and its underlying causes, and that such treatment shall be carried out *for nonpunitive purposes* not only for the protection of the addict, or person in imminent danger of addiction, against himself, but also for the prevention of contamination of others and the protection of the public. . . . It is the further intent of the Legislature that persons committed to this program who show signs of progress after an initial or subsequent periods of treatment and observation be given reasonable opportunities to demonstrate ability to abstain from the use of narcotics under close supervision in outpatient status. . . ." (Italics added.)

It is readily apparent that the Legislature intended to treat an outpatient as someone who is recovering from an illness. ▮ The purpose of the narcotic addict commitment program is not only to effect a temporary "cure" of the patient's addiction, but to rehabilitate him. (*In re Trummer* (1964) 60 Cal.2d 658 [36 Cal.Rptr. 281, 388 P.2d 277]; *People* v. *Moore* (1968) 69 Cal.2d 674 [72 Cal.Rptr. 800, 446 P.2d 800]; *People* v. *Jasso, supra,* 2 Cal.App.3d 955.) "Experience with past programs of this nature has shown that a lack of followup supervision results in a high rate of relapse. [Citations.] The present 'parole' (outpatient) system is designed to overcome this defect by providing the necessary followup through counseling, testing for narcotic use, and immediate return for further treatment if a relapse should occur. As pointed out in *In re De La O* (1963) *supra,* 59 Cal.2d 128, 145, 'These rules appear to be designed to meet the particular needs of an addict in the later stages of the process of rehabilitation.' " (*In re Trummer, supra,* 60 Cal.2d at p. 661.)

▮ The rehabilitation, as appears from the legislative declaration of policy, is to be carried out for nonpunitive purposes. It could not be otherwise since "punishment of a narcotics addict who has been *civilly* committed for treatment would constitute a violation of the Fourteenth Amendment (*Robinson* v. *State of California* (1961) 370 U.S. 660, 666-667 [8 L.Ed.2d 758, 762-763, 82 S.Ct. 1417]; *In re De La O* (1963) *supra,* 59 Cal.2d 128, 136.)" (*In re Trummer, supra,* 60 Cal.2d 658, 662.) There

is nothing in the policy of nonpunitive rehabilitation which indicates that the Legislature intended that an outpatient, by virtue of his "status" alone, should lose important unspecified constitutional rights as a condition to the creation of such status.

Rather, the Legislature has set forth the methods by which necessary infringements on the rights of outpatients may be accomplished. In order to further rehabilitation the Legislature has expressly provided that outpatient status may be granted by the Narcotic Addict Evaluation Authority "subject to all rules and regulations adopted by the authority, and subject to all conditions imposed by the authority." (Welf. & Inst. Code, § 3151.) It has further specified that "[t]he rules for persons in outpatient status shall include but not be limited to close supervision of the person after release from the facility, periodic and surprise testing for narcotic use, counseling and return to inpatient status . . . [if] the authority concludes that it is for the best interest of the person and society that this be done." (Welf. & Inst. Code, § 3152.) ■ It seems clear the Legislature intended that restrictions to be imposed upon an outpatient in some manner be expressly made a condition to the grant of outpatient status. ■ The outpatient does not lose important constitutional rights through some type of vague or inherent limitation based solely upon his "status."

■ We need not in the instant case consider specific limitations upon conditions which the Narcotic Addict Evaluation Authority *may* impose upon the release to outpatient status of a person committed either as an addict or as one in imminent danger of becoming addicted. Unquestionably the Legislature had made broad powers available to the authority, but such powers are not without limitation. The Legislature has expressly provided, for example, that outpatients "are not subject to the provisions of Penal Code Section 2600." (Welf. & Inst. Code, § 3151.) That section suspends the civil rights of persons who, unlike outpatients in the narcotics rehabilitation program, have been convicted of criminal offenses as a condition precedent and sentenced to imprisonment. Even without this legislative direction, we have held that the deprivation of particular civil rights as a condition of outpatient status was not "reasonably supportable as necessary for adequate supervision" over an outpatient's rehabilitation. (*In re Trummer, supra,* 60 Cal.2d 658, 661-662.) ■ It is thus apparent that the conditions imposed by the authority which infringe personal liberties must reasonably relate to the program's purposes of treatment and rehabilitation.

■ We deal here with important, constitutionally protected rights to be free from unreasonable searches and seizures. Such rights, where reasonably related to the achievement of a proper purpose, may be waived as a

condition to gaining some other advantage, but the waiver must appear of record to have been knowingly and intelligently made. (See *Johnson* v. *Zerbst* (1938) 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357].) ▉ A proper waiver may consist of the knowing consent to Fourth Amendment infringements as a condition to achieving a status otherwise affording greater personal freedoms. (*People* v. *Mason* (1971) 5 Cal.3d 759 [97 Cal.Rptr. 302, 488 P.2d 630].)

Statutory provision is clearly made in the instant circumstances for such a waiver. One of the major conditions upon which outpatient status is to be granted is "periodic and surprise testing for narcotic use." (Welf. & Inst. Code, § 3152.) We have heretofore held that the imposition of such a condition was made mandatory by the Legislature. (*In re Marks, supra,* 71 Cal.2d 31.) Although it requires the waiver of a Fourth Amendment right (see *Schmerber* v. *California* (1966) 384 U.S. 757, 767 [16 L.Ed.2d 908, 917, 86 S.Ct. 1826]), such condition was deemed necessary if the rehabilitative purpose of the program was not to be completely frustrated. (See *In re Marks, supra,* 71 Cal.2d 31, 39; *In re Cruz* (1965) 62 Cal.2d 307, 314 [42 Cal.Rptr. 220, 398 P.2d 412].) This Fourth Amendment waiver, however, is one which is expressly required to be exacted from each outpatient as a condition to the granting of his status.

▉ Excepting the surprise testing for narcotics use, in the instant case there are no statutory provisions, rules or regulations of the authority or stated conditions of release which expressly require one to waive the right to be free from otherwise unreasonable searches in order to be granted outpatient status.[4] The record does not warrant an inference that there existed an implied condition requiring such a waiver. We cannot conclude, accordingly, on the barren record before us that defendant can be held to have waived such an important constitutional right. As the People suggest no other basis upon which the searches without a warrant may be justified (see *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23]), we must conclude that the searches of defendant's cabin and vehicle were illegal, the contraband improperly seized, and the motion under Penal Code section 995 improperly denied.[5]

In view of the resolution of the issue raised by the unlawful search of de-

---

[4]The Narcotic Addict Evaluation Authority has since, however, added Condition 14 to its standard conditions for release of outpatients. That condition provides: "Searches: If so determined by your Supervising Agent, you will submit to search of your person or property under your domain or control."

[5]The People do not argue, nor does the record show that the search of the vehicle was a valid search incident to taking defendant into custody. Apparently the search was based on the results of the illegal search of the cabin and thus it is also invalid.

fendant's home and vehicle, it is unnecessary that we consider other issues urged by defendant as grounds for reversal.

The judgment, as to each conviction, is reversed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.