In the Matter of WILLIAM L. BALL, Respondent, v. HOWARD A. JONES, as Chairman of the Narcotic Addiction Control Commission, et al., Appellants.

In the Matter of SAMUEL A. PANNELL et al., Respondents, v. HOWARD A. JONES, as Chairman of the Narcotic Addiction Control Commission, et al., Appellants.

Fourth Department, January 17, 1974.

*Louis J. Lefkowitz, Attorney-General (Michael G. Wolfgang, Ruth Kessler Toch* and *Anthony M. Leone* of counsel), for appellants.

*Herman Schwartz* and *Edward I. Koren* for respondents.

GOLDMAN, P. J. These appeals from two judgments which enjoined the respondents-appellants Narcotic Addiction Control Commission (NACC) from returning narcotic addicts certified to NACC custody from aftercare status to resident status, without providing addicts with a hearing on the charges leading to revocation of the aftercare status and without representation by counsel, squarely present a due process issue. We are faced with the question of whether denial of procedural safeguards, including notice of charges and a hearing at which an attorney may be present prior to revocation, deprives a certificant to the NACC of due process of law as guaranteed by both the Federal and State Constitutions.

Petitioner Lynch has filed a voluntary discontinuance and has stipulated that his name shall be removed from the appeal. Petitioner Ball, a narcotic addict, was certified to NACC custody on January 14, 1971, pursuant to section 210 of the Mental Hygiene Law (now § 81.25). Petitioners Pannell and Young are narcotic addicts who were so certified on January 14, 1972

and June 19, 1969 respectively, pursuant to section 206 of the Mental Hygiene Law (now § 81.13).

On April 1, 1973, after completing more than a year of in-patient care, Ball was released on aftercare (out-patient) status from the Masten Park Rehabilitation Center. This permitted him to live outside of the treatment center but subject to certain "Performance Requirements" similar in form to conditions imposed in probation or parole cases, including regular reports to a designated narcotic aftercare officer. A few days after his release Ball's aftercare status was revoked because of "excessive intake of alcohol" and his "overall erratic reporting and abusive behavior". This action was taken upon the direction of the Director of the Center who reviewed the case and then ordered that Ball be transferred to residence in the Aftercare Halfway House where he was required to obey hours of residence, attend certain classes and programs and be subject to the revocation of his aftercare status and to be returned to the NACC facility at any time.

Petitioner Pannell was released to aftercare status on June 28, 1972, but after being convicted of disorderly conduct (public intoxication) and sentenced to time served, he was taken into custody by NACC authorities and returned on a detainer warrant to the security unit of the Center on resident status.

Petitioner Young was released to aftercare status in February, 1970 but was returned to the Center because of alleged failure to report to his aftercare officer. He was released again in February, 1972 but was declared delinquent for alleged heroin use and for cashing bad checks and returned to resident status at the NACC Center. In April, 1972 petitioner was released again to aftercare status, was arrested on a Family Court warrant and after the charges were dismissed, he was returned to the Center for the third time.

The revocation of aftercare status and the revocation of parole are in essence identical in the effect such action has on those aggrieved. Certification to the care and custody of NACC is deemed a judgment of conviction and "confinement therein is clearly imprisonment" (*People* v. *Michels,* 30 A D 2d 666, 667). Little authority on this point is available in this State. Other jurisdictions, such as California and. Massachusetts (and the Federal system), provide for clinical certification of narcotic addicts. Such authorities as exist here and in other States which denied that due process required a hearing upon revocation of aftercare status antedated *Morrissey* v. *Brewer* (408 U. S. 471) and *People ex rel. Menechino* v. *Warden* (27 N Y 2d

376). The rationale of these decisions provides the guidelines for the resolution of the appeals herein.[1]

The underlying principles involved in *Morrissey*, although applied to parole revocation, are sufficiently broad to encompass the revocation of aftercare status. Paramount in the Supreme Court's reasoning is the declaration "that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others" (*Morrissey* v. *Brewer*, *supra*, p. 482). (See, also, *Gagnon* v. *Scarpelli*, 411 U. S. 778 [probationer]; *Goldberg* v. *Kelly*, 397 U. S. 254, [welfare recipient]; *Willner* v. *Committee on Character*, 373 U. S. 96 [Bar applicant]; *People ex rel. Menechino* v. *Warden*, *supra*, p. 382 [parolee].) We fail to find the "crucial distinctions" between parole and aftercare revocation as argued by the Attorney-General. Return to resident status inflicts as "grievous" a loss of liberty on the certificant as does revocation of parole. This was succinctly stated by Chief Justice Burger in *Morrissey* at page 482. We have substituted "aftercare" for "parole" in this statement of the Chief Justice: "Subject to the conditions of his[aftercare], he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in prison [resident center]. He may have been on[aftercare] for a number of years and may be living a relatively normal life at the time he is faced with revocation * * * The liberty is valuable and must be seen as within the protection of the Fourteenth Amendment".

The Commission's practice of a review by the Director without any opportunity for the certificant to have "a simple factual hearing" (*Morrissey*) where he can present his explanation of excuse or denial contravenes the protection guaranteed by the Fourteenth Amendment. As stated in *Morrissey*, again at page 482, revocation "calls for some orderly process, however

---

1. A recent decision of the Court of Appeal, Fifth District of California, *Matter of Murillo* (110 Cal. Rptr. 494 — decided Nov. 1, 1973, as mod. Nov. 2, 1973), demonstrates the impact of *Morrissey* on that court. In 1969, in *Matter of Marks* (71 Cal. 2d 31, 47), the California court held that the Fourteenth Amendment "does not give such a right" (hearing). In recognizing that the right to a hearing had constitutional dimension since *Morrissey*, the court stated "We conclude that a C.R.C. outpatient (aftercare status) is entitled to a preliminary hearing as described in Morrissey v. Brewer, *supra*, before being recommitted to the California Rehabilitation Center".

informal''. The record indicates that after return to resident status the certificant may confer with an assigned counselor concerning the reasons for the revocation of his aftercare status. The counselor, not the addict, may then present the case to the Clinical Conference for disposition. No written charge is served upon the certificant and the only manner in which he is informed of the Conference's action is through ex post facto conversations with the counselor. Thus the fate of the certificant rests with presentation of his case to the Commission by one of its staff members. As *Morrissey* noted, (p. 486): '' The officer directly involved in making recommendations cannot always have complete objectivity in evaluating them ''.

Absent also in the procedures leading to revocation is the failure to give notice, as well as a hearing, before revocation is made. Having concluded that due process requirements mandate both notice and a hearing, we turn to the scope of such a hearing and whether a '' preliminary'' as well as a final hearing should be provided. Again we look to *Morrissey* for guidance. Inasmuch as revocation hearings are not part of a criminal prosecution '' the full panoply of rights '' which must be accorded a criminal defendant are not required. Nevertheless, *Morrissey* established certain '' minimum requirements of due process '' for a final revocation hearing which, when translated into the present context, include the following: (1) written notice of the claimed delinquency violations; (2) disclosure of the evidence against the alleged violator; (3) an opportunity to be heard and to present witnesses; (4) the right to confront and cross-examine adverse witnesses (unless, as *Morrissey* noted, good cause for denying such confrontation is specifically found); (5) a neutral and detached hearing body; and (6) a written statement of the factfinder's determination, including a statement of the rationale when revocation is ordered.

The NACC contends that granting the certificant a hearing will disrupt the '' delicate relationship '' between the addict and the Commission. A fair hearing with representation by counsel, in our judgment, would strengthen rather than weaken that relationship. Rather than impede the Commission's rehabilitative function, such hearings would have the therapeutic effect of impressing upon the certificant the intention of fair treatment, thereby enhancing '' the chance of rehabilitation by avoiding reactions to arbitrariness '' (*Morrissey* v. *Brewer, supra,* p. 484). With implementation of the minimal due process

requirements just outlined, the Clinical Conference proceedings could well be adapted so as to constitute a constitutionally sufficient hearing.

The final revocation hearing is not limited to the mere resolution of factual issues, but involves administrative discretion and expertise in predicting the ability of the delinquent certificant to continue on aftercare without reversion to narcotics use. To exercise this latter function effectively it is necessary to return an arrested or surrendered violator to the facility of his original certification where administrative and medical records are maintained and counselling information is available. Since the Commission is authorized to issue warrants of arrest directed to "any State police officer or other peace or police officer in the State" (14 NYCRR 2007.1), it may well be that an alleged violator will be apprehended "at a place distant from the state institution [such as narcotic control facility], to which he may be returned before the final decision is made concerning revocation" (*Morrissey* v. *Brewer, supra,* p. 485). Moreover, the physical demands of transporting a certificant to the appropriate facility, coupled with the administrative demands attendant to the preparation for and conduct of a revocation hearing, will undoubtedly create a time lag between apprehension and the eventual disposition of a suspected aftercare violator. For these reasons and because a hasty or erroneous revocation of a certificant's liberty may impede the rehabilitative goal of returning an addict to a normal, productive life, it seems that the "preliminary" hearing established in parole revocations by *Morrissey* should be extended hereto. (See, also, *Gagnon* v. *Scarpelli,* 411 U. S. 778, *supra,* [probationer].)

As *Morrissey* indicated (p. 485), this preliminary inquiry must "be conducted at or reasonably near the place of the alleged [aftercare] violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available". Since its limited function is merely "to determine whether there is probable cause or reasonable ground to believe" that the arrested certificant committed acts in violation of his aftercare performance requirements, this initial hearing need not be conducted before the traditional "neutral and detached" officer (*Morrissey* v. *Brewer, supra; Goldberg* v. *Kelly,* 397 U. S. 254, *supra*). By analogy to *Morrissey,* we conclude that the preliminary hearing may be held before a single narcotic aftercare officer, so long as that individual has not been responsible for reporting aftercare violations

and recommending revocation or been directly involved in the case in any other way.

Basic procedural guidelines for the preliminary hearing were established in the *Morrissey* opinion (pp. 486–487). Notice of the hearing and the alleged violations must be given to the certificant, who may then appear in his own behalf, bringing documents or witnesses who may offer relevant information. Unless the hearing officer determines that risk of harm is involved, persons who have given adverse information relative to the revocation must, at the certificant's request, be made available for questioning. The decision of the hearing officer, accompanied by a statement of reasons and an indication of the evidence relied on, should be written and forwarded for reference at the final revocation hearing.

Finally, it is necessary to consider the extent to which the assistance of counsel is required or may be permitted at the mandated hearings. We are cognizant that the United States Supreme Court has refused to hold the assistance of counsel at either a preliminary or final parole or probation hearing to be an invariable right under the Federal Constitution (*Gagnon* v. *Scarpelli, supra*). Nevertheless, it is clear after *People ex rel. Menechino* v. *Warden* (27 N Y 2d 376, *supra*) that our State Constitution creates an inviolate right to counsel at final parole revocation hearings. For reasons already discussed, it is manifest that the rationale of *Menechino* must encompass a similar right to counsel at final aftercare revocation hearings, and we so hold. " The right to be heard would be ' of little avail if it did not comprehend the right to be heard by counsel ' " (*People ex rel. Menechino* v. *Warden, supra,* p. 382, citing *Powell* v. *Alabama,* 287 U. S. 45, 68–69).

The situation relative to the preliminary hearing is undoubtedly different. The Court of Appeals has recently concluded (in the context of parole revocation) that the " due process right to counsel at a preliminary revocation hearing under the State Constitution should be coextensive with that under the Federal Constitution and no more. Whether due process requires the assistance of counsel at this preliminary stage should depend on the peculiarities of particular cases " (*People ex rel. Calloway* v. *Skinner,* 33 N Y 2d 23, 32, affg. 41 A D 2d 106).

Whether counsel should be permitted at a preliminary aftercare revocation hearing is, therefore, a decision left to the sound discretion of the NACC to be decided on a case-by-case basis. In reaching its decision, however, the Commission authorities must not be unmindful of the guidelines set forth in the *Calloway*

decision (pp. 31–32). It is noted that presumptively, counsel should be provided where the alleged violator makes such a request and claims either that he has not committed the alleged violation or that even where a breach is evident there are substantial reasons which justified or mitigated the violation so that revocation would be inappropriate. Above all, the Commission must be alert to consider, especially in doubtful cases, whether the certificant appears to be capable of speaking effectively for himself.

The judgments should be affirmed.

DEL VECCHIO, WITMER, CARDAMONE and HENRY, JJ., concur.

Judgment in *Matter of Ball* unanimously affirmed, with costs.

Judgment in *Matter of Pannell* unanimously affirmed, with costs.