[Crim. No. 17626. In Bank. July 23, 1974.]

In re CHARLES RAY BYE on Habeas Corpus.

## Counsel

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, A. Wells Petersen and Michael D. Wellington, Deputy Attorneys General, for Appellant.

Rowan K. Klein for Respondent.

## Opinion

**WRIGHT, C. J.**—In a habeas corpus proceeding, the People appeal from an order directing the Narcotic Addict Evaluation Authority (NAEA) to discharge petitioner Charles Ray Bye from custody, and return him to outpatient status (Welf. & Inst. Code, § 3151)[1] as an individual theretofore duly committed under the civil addict program (§ 3000 et seq.).[2] The issue presented is whether due process principles enunciated by the United States Supreme Court in *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593] and its progeny dictate that before NAEA may, pursuant to a finding of a violation of a condition of outpatient status

---

[1]Hereinafter, unless otherwise indicated, all statutory references are to sections of the Welfare and Institutions Code.

[2]By the time the order was entered, NAEA had already restored petitioner's outpatient status on the basis of recommendations by staff and nonstaff psychiatrists and psychologists. The instant case is not moot, however, as petitioner remains subject to revocation of his outpatient status at any time. Moreover, this precise issue is the subject of numerous habeas corpus petitions currently pending, thus rendering its resolution a matter of critical public importance. (*In re William M.* (1970) 3 Cal.3d 16, 23-24 [89 Cal.Rptr. 33, 473 P.2d 737]; see also, *In re Law* (1973) 10 Cal.3d 21, 23 [109 Cal.Rptr. 573, 513 P.2d 621]; *In re Fluery* (1967) 67 Cal.2d 600, 601 [63 Cal.Rptr. 298, 432 P.2d 986]; *County of Madera* v. *Gendron* (1963) 59 Cal.2d 798, 804 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555].)

(§ 3152), revoke such status of an individual committed to the program it must first afford him: (1) a prerevocation hearing near the site of the alleged violation and (2) a formal revocation hearing at the California Rehabilitation Center (CRC) in Norco, California. We hold that an outpatient's interest in his conditional liberty status is not unlike that possessed by a parolee and that he is entitled to certain procedural due process safeguards to protect that status from arbitrary revocation. We conclude, however, that the entire panoply of procedures outlined in *Morrissey* as applicable to parole revocations is neither constitutionally mandated nor practically desirable in revocations by NAEA.[3]

The People contend that *Morrissey*'s dictates are inapplicable to outpatient status revocations due to differences between the goals and mechanics of the civil addict program and those of the parole system. They further argue that the individual outpatient's interest in being accorded procedural safeguards is always outweighed by the state's interest in effectively and humanely dealing with the social malaise of narcotic addiction.

Neither contention is entirely consistent with *Morrissey*, wherein the United States Supreme Court settled on a two-step analysis in applying the dictates of procedural due process in one narrow context—the revocation of parole. A similar methodology is proper whenever an individual claims he is entitled to due process protections against a potential deprivation by the state of a liberty or property interest.

■ First, we must determine whether the individual is entitled to *any* procedural protection by examining the extent to which he "will be 'condemned to suffer grievous loss' [citations omitted]" (*Morrissey* v. *Brewer, supra*, 408 U.S. at p. 481 [33 L.Ed.2d at p. 494]) by claimed arbitrary

---

[3] The minimal due process requirements mandated by *Morrissey* include an in-community prerevocation hearing which must be held before an independent officer. The purpose of such a hearing is to determine whether probable cause exists to believe the parolee has violated conditions of parole. The parolee is entitled to speak in his own behalf, to present evidence and cross-examine certain adverse witnesses, and to be provided with an informal statement of reasons for a decision revoking parole as well as an indication of what evidence was relied upon. (*Morrissey* v. *Brewer, supra,* 408 U.S. 471, 486-487 [33 L.Ed.2d 484, 497-498].)

The revocation hearing must promptly follow the preliminary hearing. There, the parolee is entitled to: "(a) written notice of the claimed violations of parole; (b) disclosure . . . of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." (*Id.,* at p. 489 [33 L.Ed.2d at p. 499].)

action of the state. This entails inquiring whether the interest which is threatened is within the contemplation of the liberty or property language of the Fourteenth Amendment. (*Id., Board of Regents* v. *Roth* (1972) 408 U.S. 564, 570-571 [33 L.Ed.2d 548, 556-557, 92 S.Ct. 2701].) Then, "[o]nce it is determined that due process applies, the question remains what process is due." (*Morrissey* v. *Brewer, supra,* 408 U.S. at p. 481 [33 L.Ed.2d at p. 494].) It is during this second inquiry that the relative interests of the individual and the state must be balanced. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." (*Id.,* quoting *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 895 [6 L.Ed.2d 1230, 1236, 81 S.Ct. 1743]; see also, *Wolff* v. *McDonnell* (1974) 418 U.S. 539, 560 [41 L.Ed.2d 935, 953, 94 S.Ct. 2963]; *Board of Regents* v. *Roth, supra,* 408 U.S. 564, 570-571; *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 378 [28 L.Ed.2d 113, 119, 91 S.Ct. 780]; *Hannah* v. *Larche* (1960) 363 U.S. 420, 440 [4 L.Ed.2d 1307, 1320, 80 S.Ct. 1502]; Parsons-Lewis, *Due Process in Parole-Release Decisions* (1972) 60 Cal.L.Rev. 1518, 1546-1548.)

Applying the first level of the test and scrutinizing the interest of the parolee in his conditional liberty status, Chief Justice Burger in *Morrissey* concluded that it was an interest worthy of due process protection. (*Morrissey* v. *Brewer, supra,* 408 U.S. at p. 482 [33 L.Ed.2d at pp. 494-495];. *People* v. *Vickers* (1972) 8 Cal.3d 451, 456 [105 Cal.Rptr. 305, 503 P.2d 1313].) "The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked." (408 U.S. at p. 482 [33 L.Ed.2d at pp. 494-495], fns. omitted.)

Similar to the parolee, the CRC outpatient may lead a relatively normal

life while in his conditional status. That status, albeit subject to revocation, "enables him to do a wide range of things open to persons who have never been convicted of any crime." (*Id.*) Although the outpatient may be required to submit to periodic and surprise testing for narcotic use and may also be ordered to maintain close contact with a specially trained parole agent (§ 3152), he retains his civil rights (*People* v. *Myers* (1972) 6 Cal.3d 811, 818 [100 Cal.Rptr. 612, 494 P.2d 684]; *People* v. *Jasso* (1969) 2 Cal.App.3d 955, 963-964 [82 Cal.Rptr. 229]) and is not considered "civilly dead" for certain purposes as is the parolee whose conditional liberty interest has heretofore been deemed protected.[4] Equally important, as in the case of the parolee, the outpatient has relied on the state's promise that his conditional liberty will not be revoked unless he fails to abide by the conditions of his release and he is obligated to control his conduct accordingly.

Upon revocation of his outpatient status the individual is incarcerated in the walled facility at Norco, a security institution (*People* v. *Pruett* (1973) 31 Cal.App.3d 1, 4 [105 Cal.Rptr. 204]) where he may remain for several years.[5] There the daily routine is geared toward overcoming narcotic addiction and it imposes a strict regimen. (See Wood, *The Civil Narcotics Program: A Five-Year Progress Report* (1967) 2 Lincoln L.Rev. 116, 119-122 (hereinafter referred to as Progress Report).) Finally, subsequent to his return to CRC, he may be excluded from the civil addict program altogether and in appropriate cases returned to court to face criminal proceedings. (§ 3053.)[5a]

Although the Legislature has denominated the narcotic rehabilitation plan "civil" rather than "penal"[6] the use of one label rather than the other does not alter the applicability of due process protections to the outpatient's conditional liberty interest. In determining that juveniles were entitled to certain due process safeguards before the state could officially designate

---

[4]Penal Code section 2600, which suspends the civil rights of those sentenced to prison, is expressly rendered inapplicable to CRC outpatients by section 3151.

[5]Section 3201 sets the maximum term of commitment at seven years, but permits an extension of up to three years upon approval of the committing court. A person voluntarily committed (under § 3100) must be discharged no later than two years and six months after his commitment.

[5a]More recently, in *Wolff* v. *McDonnell, supra,* 418 U.S. 539, the court held that a prison inmate's interest in statutory good-time credit was within the Fourteenth Amendment's liberty concept, and established procedures for safe-guarding that interest. Certainly the outpatient's interest in remaining in the community is as worthy of due process protection.

[6](§ 3000; see also, Belton, *Civil Commitment of Narcotics Addicts in California: A Case History of Statutory Construction* (1968) 19 Hastings L.J. 603, 605-614 (hereinafter referred to as Case History).)

them delinquents and treat them accordingly, the Supreme Court in *In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428] ignored the nomenclature in the Arizona juvenile justice statutes and looked to the nature of that scheme and its effect upon the individual. The court noted, "[u]ltimately, however, we confront the reality of that portion of the Juvenile Court process with which we deal in this case. A boy is charged with misconduct. The boy is committed to an institution where he may be destrained of liberty for years. It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School." (*Id.,* at p. 27 [18 L.Ed.2d at p. 546].)

We accordingly conclude that an outpatient possesses an interest in his liberty which is entitled to due process protections, and turn to an examination of what procedures should be established to safeguard that interest.

■ Due process is a flexible concept; the precise procedures necessary to prevent the arbitrary deprivation of a constitutionally protected interest vary "with the subject-matter and the necessities of the situation." (*Moyer* v. *Peabody* (1909) 212 U.S. 78, 84 [53 L.Ed. 410, 416, 29 S.Ct. 235]; *Cafeteria Workers* v. *McElroy, supra,* 367 U.S. at p. 895 [6 L.Ed.2d at p. 1236]; *Stanley* v. *Illinois* (1972) 405 U.S. 645, 650-651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208]; *Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 254 [53 Cal.Rptr. 673, 418 P.2d 265]; *Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 170-172 [65 Cal.Rptr. 297, 436 P.2d 297]; *In re Franklin* (1972) 7 Cal.3d 126, 135 [101 Cal.Rptr. 553, 496 P.2d 465]; *Thorn* v. *Superior Court* (1970) 1 Cal.3d 666, 673 [83 Cal.Rptr. 600, 464 P.2d 56].)

■ In the instant situation, the individual's interest in insuring that the revocation of his right to remain at liberty be for cause must be balanced against the NAEA's need to conduct its weighty mission of rehabilitating addicts with a minimum of interference and a maximum of speed. As will be explained, we are persuaded that although CRC outpatients are entitled to due process in the revocation of their status of conditional liberty, significant differences between the purpose and practice of the narcotic rehabilitation program and the parole system are such that the procedures need not be identical to those mandated in *Morrissey* for parole revocation.

The circumstances surrounding the creation and subsequent shaping of the California civil addict program have been well-chronicled and therefore need not be reviewed in detail here. (See *Case History, supra; Progress Report, supra;* Note, *Control and Treatment of Narcotic Addicts: Civil*

*Commitment in California* (1969) 6 San Diego L.Rev. 35.) The program was designed to avoid the hopeless "revolving door" situation of jailing addicts for crimes committed under compulsion of habit, freeing them on parole (or at the expiration of their term), and then rejailing them upon their inevitable return to addiction and renewed criminality. Although it focusses on peer group and professional counseling while the patient is at CRC, the program is also directed toward speedily returning patients to the community in order to facilitate prompt adaptation to the environment in which they will eventually be compelled to function. Unavoidably, many releases are premature; nevertheless the NAEA continues to operate under the assumption that an unsuccessful premature release is preferable to an unnecessarily delayed one. It is a calculated risk wisely assumed upon mature reflection. We recognized this policy in *In re Marks* (1969) 71 Cal.2d 31 [77 Cal.Rptr. 1, 453 P.2d 441], noting, "suspension and return of an outpatient, usually for a brief period, does not denote ultimate failure, and should be considered rather as a step in the total process of rehabilitation." (*Id.*, at p. 49, fns. omitted; see also Wood, *New Program Offers Hope for Addicts* (Dec. 1964) 28 Fed. Prob. p. 44.)[7]

The release and return pattern is well illustrated by petitioner's case history. He originally entered the program in 1962 as a voluntary admittee. In 1968 he was convicted of a narcotics offense and was involuntarily committed.[8] In 1969 he was released on outpatient status, but that status was suspended and he was returned to CRC five months later. He was released and returned twice in 1970 on predetermined limited placement releases. Later that year he was again released on outpatient status but was thereafter returned within a period of seven months. In 1971, he was released once more; the circumstances surrounding his return in 1973 prompted the instant proceedings. As we have noted, he is once again on outpatient status.

This continuing drama militates toward a more informal hearing procedure than that required for parole revocations. While an estimated 35 to 45 percent of all parolees are subjected to revocation and are returned to

---

[7]Statistics bear out this policy. During 1969, 47.6 percent of the men and 45 percent of the women released as outpatients saw that status suspended in the same year. (Cal. Dept. of Corrections, Summary Statistics: Civil Commitment Program for Narcotic Addicts (1969) pp. 65-66.) The median duration of inpatient treatment following such a return for 1973 and the first quarter of 1974, is four months. (*Id.*, May 16, 1974, update.) Finally, as of December 31, 1972, 42.2 percent of the males and 39 percent of the females in the program had their outpatient status revoked one or more times. (*Id.*, 1973 update.)

[8]The record is silent as to his whereabouts and activities between 1962 and 1968. As a voluntary admittee, his discharge was mandated no more than two and one-half years after his admittance. (§ 3201.)

prison (*Morrissey* v. *Brewer, supra,* 408 U.S. 471, 479 [33 L.Ed.2d 484, 493]), suspension of outpatient status and return to CRC occurs in an estimated 70 to 75 percent of the cases. The frequency of the suspension of outpatient status as compared to the frequency of the revocation of parole must also be viewed in light of the differences in the length of incarceration which the returned outpatients and parolees may expect. The former may be held a maximum of seven years (with a small statistical likelihood of staying at CRC for a long period of time) while the latter normally face the refixing of their terms at maximum (see *In re Brown* (1967) 67 Cal.2d 339 [62 Cal.Rptr. 6, 431 P.2d 630]) as well as the possibility of lengthy terms of imprisonment.

A further material distinction in the goals of the narcotics rehabilitation and parole programs is discussed in *Marks*[9] where we stressed the need for the NAEA and its agents to act promptly upon evidence of the appearance of distress signals that often mark the potential reversion of an outpatient to narcotic addiction. "When [the outpatient] fails on outpatient status, his reversion to illegal narcotics proceeds swiftly. Unless the rehabilitation authorities are empowered to act with equal swiftness to remove him from the contaminating environment and provide him with the necessary physiological and psychological support, the timetable of his recovery may be severely set back. It is for this reason that in *In re Trummer* (1964) *supra,* 60 Cal.2d 658, 661 [36 Cal.Rptr. 281, 388 P.2d 177], we characterized this aspect of the outpatient program as 'the *immediate* return for further treatment if a relapse should occur.' (Italics added.)" (*In re Marks, supra,* 71 Cal.2d at pp. 48-49, fns. omitted; see also *Progress Report, supra,* at p. 128.)

A final factor which distinguishes CRC outpatient revocations from parole revocations is the need for immediate medical treatment which is an integral part of the CRC program. The outpatient is, as the term implies, a patient recovering from an illness (*People* v. *Myers, supra,* 6 Cal. 3d 811, 817) and "whether or not any given [individual] can be treated with success is a fact which, in the last analysis must be determined . . . by people trained in that field and actually engaged in the treatment

---

[9]In *In re Marks, supra,* 71 Cal.2d 31, we held, inter alia, that revocations of CRC outpatient status were not within the ambit of constitutionally mandated procedural protection. (*Id.,* at pp. 45-49.) Rendered prior to *Morrissey, Marks* relied upon such precedents as *In re Davis* (1951) 37 Cal.2d 872 [236 P.2d 579], which are "no longer in accord with federal constitutional requirements." (*People* v. *Vickers, supra,* 8 Cal.3d 451, 455.) Those portions of *Marks* germane to the due process issue before us are no longer controlling. The lengthy analysis of the functions and goals of the civil addict program enumerated there, however, remains unaffected by subsequent developments in constitutional law.

process." (*People* v. *Marquez* (1966) 245 Cal.App.2d 253, 256 [53 Cal. Rptr. 854].) Again, petitioner's case history is instructive. The suspension which prompted this case was initiated not because petitioner had committed a new crime or because he was suspected of having resumed narcotic use. Rather, his parole agent feared petitioner's imminent return to narcotics due to reports by neighbors that he was behaving irrationally.[10]

Having chronicled those features by which the narcotics rehabilitation program differs from the parole program, we next consider whether the distinctions warrant different due process considerations insofar as an in-community prerevocation hearing is required in CRC cases. Such a hearing was found to be necessary in *Morrissey* in order to insure that an individual not directly involved with the parolee determine, soon after the latter is taken into custody, the existence of probable cause to believe that a parole violation had occurred. This safeguard provides the parolee with a forum promptly convened near the site of the alleged violation. Although it may in appropriate cases also be helpful to provide a prompt in-community hearing to a CRC outpatient suspected of violating the conditions of his release, two considerations compel us to conclude that on balance due process does not require such a preliminary determination in those cases where the outpatient is apprehended for reasons relating to resumed narcotic use or for symptoms or actions indicating the imminent danger of return to narcotic use.

First, and most important, timing is a more critical factor in a narcotics as distinguished from a criminal rehabilitation program. In the parole situation a delay, while highly undesirable since it may subject one innocent of the alleged violation to prolonged and unnecessary incarceration, does not present a serious threat to the destruction of that degree of rehabilitation which had been achieved prior to the alleged violation. In cases where an outpatient is suspected of having resumed narcotic use, however, the NAEA's interest in removing him to the CRC for immediate treatment is paramount, as progress towards rehabilitation which has been accomplished is seriously jeopardized by a remission which is not immediately treated.

In the great majority of outpatient status revocations the cause is the resumption of illegal drug use (Cal. Dept. of Corrections, Research Report

---

[10]This behavior took the form of petitioner allegedly harrassing a neighbor's wife, making bizarre telephone calls to his parole agent and asserting claims that his apartment was bugged. Our current concern is not whether the revocation decision was a substantively sound one; instead we are now concerned solely with establishing procedures for insuring that the decision is based upon the NAEA's full exposure to all relevant facts.

No. 33, Narcotic Addict Outpatient Program One Year Follow-up (1969) p. 35; *Progress Report, supra,* at p. 127.) Often the outpatient fails a periodic or surprise narcotics test, or his parole agent observes fresh needle marks (*In re Murillo, post,* p. 113 [115 Cal.Rptr. 393, 524 P.2d 865]) or he reveals to the parole agent that he has recently used narcotics (*In re Murillo, supra, post,* p. 113; *In re Bianco, post,* p. 113 [115 Cal.Rptr. 393, 524 P.2d 865]). Although a legitimate purpose of a prerevocation hearing would be to establish that the perception and statements of the arresting officer, complaining witness or test administrator are accurate in cases where the alleged violation relates to suspected narcotic use, the medical necessity of a prompt return must be deemed to outweigh the need to attack the complainant's perception and statements at a preliminary hearing. An outpatient's alleged admission of a violation before an individual other than a neutral hearing officer is not, of course, determinative at his eventual revocation hearing. (See *Morrissey* v. *Brewer, supra,* 408 U.S. 471, 476-477 [33 L.Ed.2d 484, 491-492].)

Second, a revocation decision in the civil addict program is often a medical one and as such is necessarily less subject to objective scrutiny by a lay hearing officer. Although a local hearing to probe the accuracy of the conclusions as determined by the outpatient's parole agent is desirable, on many occasions it is likely that a person not professionally qualified and not familiar with the outpatient's case history is incapable of determining whether those conclusions, even if uncontested, would constitute a violation of the conditions of release.

A primary reason for requiring an in-community prerevocation hearing in parole revocations is to insure that the accused is afforded a prompt opportunity to test whether he is being deprived of his conditional liberty on probable cause therefor. In *People* v. *Vickers, supra,* 8 Cal.3d 451 we noted that *Morrissey* did not preclude ". . . the holding of the two proceedings in close or immediate sequence to each other providing that the due process protections declared in that decision are not infringed." (*Id.,* at p. 459, fn. 8.) In approving the holding of a single hearing but warning that the *Morrissey* due process protections not be eroded thereby we implicitly required that such a unitary hearing be held promptly.

By not requiring an in-community prerevocation hearing in all cases where CRC outpatient status may be revoked, we accord great weight to the need of an immediate return of a defaulting outpatient to the treatment facilities at CRC. We deem a prompt return policy to be fundamental to the success of the civil addict program. Section 3151 provides that "[a] single member of the [NAEA] may by written or oral order suspend the

release in outpatient status of such a person and cause him to be retaken, until the next meeting of the authority." This provision requires that in those cases where the outpatient is suspected of having resumed drug use, he must be returned to CRC upon notice to local authorities from a NAEA member. Any detention in a local jail must be only temporary in nature—a brief incarceration which does not stall the outpatient's prompt return to CRC for medical treatment.

In the majority of outpatient revocations, the outpatient is initially apprehended by his parole agent or a local peace officer pursuant to section 3152 which vests in the NAEA the authority to return the outpatient to inpatient status at CRC. In *In re Murillo, supra, post,* p. 113, the outpatient was apprehended by his parole agent after failing to report and allegedly admitting he had resumed narcotic use. The agent also purported to have seen recent puncture marks on Murillo's arms. Despite the requirement and necessity for a prompt return to CRC, Murillo languished in the Tulare County jail for two weeks until the NAEA met to consider his case along with others. He was then ordered returned to Norco. Testimony at the hearing on his writ of habeas corpus established that due to the prevailing practice the return to CRC of an outpatient suspected of having resumed narcotic use is not considered by the NAEA until one to three weeks following the outpatient's apprehension. Such a practice clearly frustrates the prompt return policy necessary to the effectiveness of the civil addict program. It is manifest that a record demonstrating such an abuse in administering the program will entitle individual outpatients to relief where the abuse constitutes a denial of due process. And, should it appear that NAEA cannot administer its program in compliance with the prompt return policy, a reevaluation of our determination that due process does not require a prerevocation hearing may be necessary.[11]

We therefore conclude that, following a charge of a violation by NAEA indicating an imminent return to the use of narcotics, a single revocation hearing held as soon as reasonably possible upon an outpatient's prompt return to CRC will permit the early releases sought by NAEA without

---

[11]When an outpatient is taken into custody under circumstances indicating resumed drug use, or his parole agent reasonably fears that the outpatient is in danger of returning to narcotics, the agent must notify NAEA immediately. As previously stated, any NAEA member may order the outpatient returned to CRC pursuant to section 3151. We are cognizant of the priority which must be afforded to the disposition of criminal charges which may have stemmed from conduct which prompted the outpatient's apprehension. Disposition of such newly charged offenses, of course, would take precedence over the prompt return policy.

depriving the outpatient of procedural due process.[12] Outpatients who are taken into custody for purported violations of conditions of their outpatient status which do not indicate an imminent return to narcotics may nevertheless be accorded the same unitary revocation procedure when given the benefit of the prompt return policy. (*People* v. *Vickers, supra,* 8 Cal.3d 451, 459, fn. 8.)

■ Notwithstanding our conclusion that no preliminary hearing need be held in those cases where the outpatient is promptly returned to CRC because it is reasonably concluded that he has returned or is in danger of returning to narcotic use, he is still entitled, promptly upon his apprehension, to certain due process protections which do not frustrate NAEA's administration of the civil addict program. He must be provided with a written statement which enumerates the charges against him, the evidence relied upon and the names of the witnesses who have offered evidence against him. The document must also inform him of his right to challenge the truth of the charges at the revocation hearing which will be held shortly after his return to CRC.[13]

We are mindful that by authorizing a single revocation hearing, that proceeding serves as the sole buffer between the outpatient and arbitrary treatment. Thus, certain minimal due process safeguards must be provided to insure that the outpatient has "an opportunity to be heard and to show, if he can, that he did not violate the conditions, or if he did, that circumstances in mitigation suggest that the violation does not warrant revocation." (*Morrissey* v. *Brewer, supra,* 408 U.S. 471, 488 [33 L.Ed.2d 484, 498].)

---

[12]Faced with a revocation of aftercare status under a New York civil addict program similar to the California scheme, the appellate division of the Supreme Court first found that an aftercare patient possesses a protectible liberty interest and then held that a preliminary as well as a final hearing is compelled by *Morrissey.* (*Ball* v. *Jones* (1973) 43 App.Div.2d 281 [351 N.Y.S.2d 199].) The preliminary hearing announced there is an abbreviated version of the one described in *Morrissey.* The court deemed such a hearing necessary, anticipating a time lag between arrest and "eventual disposition" of the aftercare patient. We decline to subscribe to the court's reasoning in light of our recognition of the need for immediate return to CRC when the outpatient is suspected of being in imminent danger of resuming narcotic use and our requirement of prompt hearings immediately after return to CRC.

[13]Since the single hearing will be held at Norco, which is located miles from many of the state's population centers, some outpatients may have difficulty in producing witnesses in their own behalf. On balance, however, the necessity for immediate medical (including psychiatric) attention which can best be rendered by the experts at CRC, is determinative. The parole officer or other person responsible for initiating the revocation process must be present either in person or by affidavit in the absence of a waiver by the outpatient. Moreover, in cases where a chemical test such as nalline indicates narcotic use or where the parole agent observes recent injection marks on the outpatient, the need for defense witnesses and the potential value of their testimony is very slight when weighed against the need for immediate treatment.

As the revocation hearing at CRC serves the same function as the final parole revocation hearing defined in *Morrissey,* we believe that the "minimum requirements of due process" enumerated .therein are appropriate for the hearing we today conclude is necessary in CRC cases. The outpatient is entitled to (1) written notice of the claimed violations of his release; (2) disclosure of evidence against him; (3) the opportunity to ·be heard in person and to present witnesses and documentary evidence; (4) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (5) a neutral hearing body such as the NAEA or a hearing officer or officers selected by the NAEA; and (6) a written statement by the factfinder as to the evidence relied on and reasons for revoking outpatient status.[14] In addition, the outpatient should be represented by counsel if NAEA determines that the matter comes within the ambit of those cases where such assistance is deemed necessary under the guidelines set out in *In re Love* (1974) 11 Cal.3d 179, 186 [113 Cal.Rptr. 89, 520 P.2d 713], and *Gagnon* v. *Scarpelli* (1973) 411 U:S. 778, 790-791 [36 L.Ed.2d 656, 666-667, 93 S.Ct. 1756].

Although it is likely that witnesses adverse to the outpatient, presumably CRC psychiatrists, psychologists and parole agents or other peace officers will be available to NAEA, outpatients may have greater difficulty in producing witnesses. Many CRC outpatients are not financially capable of transporting even willing witnesses to Norco, and, if such witnesses were required to be present in person, some outpatients would be deprived of a crucial defense. The problem, however, may be resolved by permitting the submission of affidavits and other documents to the factfinder.[15]

■ Whether a newly enunciated constitutional rule should be given

---

[14]The furnishing of such reasons should present only a minimum of administrative burden to the NAEA. In *In re Strum* (1974) 11 Cal.3d 258 [113 Cal.Rptr. 361, 521 P.2d 97], we required the Adult Authority to furnish written statements of reasons to prisoners upon a decision denying an application for parole.

In many such situations the outpatient will undoubtedly waive the holding of a revocation hearing since proof of the reasons for violation will be readily apparent. In such instances the written waiver should be attached to the statement of reasons for the revocation.

[15]This problem was anticipated in *Morrissey* where the court held that parolees were entitled to "present witnesses and documentary evidence" at their revocation hearings. (408 U.S. at p. 489 [33 L.Ed.2d at p. 499].) The court elaborated on the use of nonlive testimony in *Gagnon* v. *Scarpelli, supra,* stating, "[w]hile in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence." (411 U.S. at p. 783, fn. 5 [36 L.Ed.2d at p. 662].)

retroactive or only prospective application is determined by examining: "(1) the purpose of the new rule; (2) the extent of reliance upon the old rule; and (3) the effect retroactive application would have upon the administration of justice." (*Halliday* v. *United States* (1969) 394 U.S. 831, 832 [23 L.Ed.2d 16, 19, 89 S.Ct. 1498]; *In re Love, supra,* 11 Cal.3d at p. 187; *Mills* v. *Municipal Court* (1973) 10 Cal.3d 288, 308 [110 Cal. Rptr. 329, 515 P.2d 273].)

■ The purpose of our holding herein is to provide a quantum of due process protection to outpatients threatened with the loss of their interest in conditional liberty by providing them with a means of insuring that the discretionary decision to terminate that interest is made upon a full understanding and awareness of all relevant facts. The opportunity to appear at such a forum to protect such interest is a fundamental constitutional right. However, providing hearings for all outpatient suspensions since *Morrissey's* effective date, June 29, 1972, probably would not result in a clearer determination of the facts surrounding those revocations. Such administrative decisions are often based upon subtle variations of normal behavior patterns, and the likelihood of lay witnesses' accurately recalling such behavior is slight. Other revocations stem from resumed narcotic use evidenced by objective medical tests and while neither such tests nor the people who administer them are infallible, relitigating them now would prove fruitless.

The Department of Corrections and the NAEA, in adhering to the belief that due process does not mandate procedures at which the outpatient may challenge the revocation decision, have established no such procedures. This belief was reasonable. (See *In re Marks, supra,* 71 Cal.2d 31.)

Most important, retroactive application of our holding would have a devastating effect upon the administration of the civil addict program. We have been advised that hundreds of prior revocation decisions have been attacked by writs of habeas corpus which are currently pending in trial and appellate courts throughout the state. Additional hundreds of outpatient revocations have occurred subsequent to June 29, 1972, under the NAEA's early release philosophy and procedures. To compel a part-time understaffed board (see § 3150) or its delegates to hold such a great number of hearings in an attempt to correct prior suspension procedures would unduly impede that body from carrying on its statutory duty of rehabilitating narcotic addicts.

We thus deem our holding of prospective application only. No indi-

vidual apprehended for alleged violations of the conditions of his release subsequent to the filing of this opinion may have his CRC outpatient status revoked without first being afforded the procedures we have established herein.

Although petitioner was again released on outpatient status following the apprehension which prompted the instant action, he contends that the number of his outpatient status revocations is determinative of his eventual discharge date within the perimeters of section 3201, and he should thus be afforded an opportunity to contest the validity of the most recent revocation.[16] In light of the NAEA's early release policy which anticipates several temporary detours within the rehabilitative process, we are of the view that the contention has no merit.

Since our holding is of prospective application only, the order is reversed.

McComb, J., Tobriner, J., Mosk, J., Burke, J., Sullivan, J., and Clark, J., concurred.

Appellant's petition for a rehearing was denied August 21, 1974.

---

[16]Unlike in the parole situation where the length of the underlying sentence is indeterminate and is refixed upon a revocation (see, e.g., *In re Love, supra,* 11 Cal.3d at p. 185, fn. 4), no such formal redeterminations occur in the civil addict program.