[Crim. No. 6359. Fourth Dist., Div. Two. Nov. 18, 1974.]

In re EDWARD M. MORALES on Habeas Corpus.

**COUNSEL**

Evelle J. Younger, Attorney General, and Alan S. Meth, Deputy Attorney General, for Appellant.

Lawrence M. Gassner, under appointment by the Court of Appeal, for Respondent.

---

## OPINION

**GARDNER, P. J.**—In 1965, petitioner was sentenced to state prison on a forgery charge. In 1970, he was released on parole. Sometime thereafter, he left California without permission. On March 24, 1973, he was arrested in Arizona as a parole violator. No new crime was alleged. He waived extradition and was returned to state prison on April 13, 1973. Five months later on September 11, 1973, not having received a revocation hearing, petitioner filed a petition for a writ of habeas corpus. A month later on October 12, 1973, a revocation hearing was held in which petitioner admitted leaving the state and failing to report to his parole officer. He had previously requested two witnesses to appear in his behalf at the revocation hearing but these witnesses were unable to remain in California. However, the Adult Authority panel which conducted the parole revocation proceeding stipulated that these witnesses would have testified to petitioner's good character. Petitioner's parole was revoked.

On December 7, 1973, a hearing was held on the petitioner's petition for a writ of habeas corpus. The court ordered the petitioner released and reinstated on parole. The court also ordered that the Adult Authority strike from its record the charged violations of parole and not consider them thereafter. A 10-day stay was granted to allow the Attorney General to appeal.

On May 23, 1974, defendant was released on parole. While in many respects the matter appears moot, the Attorney General chooses to pursue the matter because of that portion of the order barring the Adult Authority from ever considering the alleged violation for any purpose. However, the real issue—apparently an issue of first impression in this state—is the effect of extradition proceedings vis-à-vis *Morrissey* v. *Brewer,* 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593].[1] ■ In this respect, defendant contends that there was a violation of *Morrissey* when he did not receive an in-community or prerevocation hearing at or near the time of his arrest,

We hold that there was no violation of *Morrissey* based on the lack of such a hearing, that under the facts of this case extradition proceedings

---

[1]We assume that the demands of *Morrissey* for two hearings (1) an in-community or prerevocation hearing, and (2) an in-institution or revocation hearing and the elements of these hearings, are by this time known to all. We will not burden the reader with another rehashing of that aspect of *Morrissey*.

were an adequate substitute for the in-community or prerevocation hearing, and that after extradition proceedings a prompt revocation hearing will suffice to comport with the due process requirements of *Morrissey*.

Due process has often been characterized as an elusive concept which calls for such procedural protections as the particular situation demands. It requires the weighing of the interests of the parties involved and, to be workable, it must be plentifully laced with pragmatic consideration. In *Morrissey*, the court made it clear that it was promulgating a flexible doctrine to be administered reasonably and was not mandating a procedural strait jacket for each state. "We cannot write a code of procedure; that is the responsibility of each State. . . . (¶) We have no thought to create an inflexible structure for parole revocation procedures." (*Morrissey* v. *Brewer, supra,* 408 U.S. 471, at pp. 488-490 [33 L.Ed.2d 484, at pp. 498-500].) In *Gagnon* v. *Scarpelli,* 411 U.S. 778 [36 L.Ed.2d 656, 93 S.Ct. 1756], the same court in commenting on *Morrissey* said: ". . . due process is not so rigid as to require that the significant interests in informality, flexibility, and economy must always be sacrificed." (At p. 788 [36 L.Ed.2d. at p. 665].) "Nor did we intend to foreclose the States from . . . developing other creative solutions to the practical difficulties of the *Morrissey* requirements." (Fn. 5 at p. 783 [36 L.Ed.2d at p. 662].)

The Supreme Court of this state in *In re Bye,* 12 Cal.3d 96 [115 Cal.Rptr. 382, 524 P.2d 854], applied the principles of *Morrissey* to outpatients from the California Rehabilitation Program and concluded that the entire panoply of procedure outlined in *Morrissey* was neither constitutionally mandated nor practically desirable in the CRC program, and that in-community or prerevocation hearings might be dispensed with because the nature of the proceedings and the interests of the state and the individual warranted such a decision. *Bye* held that a single revocation hearing at the CRC following the suspension of outpatient status satisfied *Morrissey*. (For other applications of this concept of a reasonable, flexible application of *Morrissey,* see *In re La Croix,* 12 Cal.3d 146, 152, fn. 2 [115 Cal.Rptr. 344, 524 P.2d 816]; *In re Law,* 10 Cal.3d 21, 26 [109 Cal.Rptr. 573, 513 P.2d 621]; *People* v. *Vickers,* 8 Cal.3d 451, 459, fn. 8 [105 Cal.Rptr. 305, 503 P.2d 1313]; *People* v. *Calais,* 37 Cal.App.3d 898, 902 [112 Cal.Rptr. 685]; *People* v. *Scott,* 34 Cal.App.3d 702, 708 [110 Cal.Rptr. 402]; *In re Edge,* 33 Cal.App.3d 149 [108 Cal.Rptr. 757]; *In re Scott,* 32 Cal.App.3d 124 [108 Cal.Rptr. 49].)

It is simply not reasonable to demand an in-community or prerevocation hearing for a parolee who has fled the state and is apprehended in another state.

The basic principles of the in-community or prerevocation hearing are (1) that it be a prompt hearing when information is fresh and the sources of information available, and (2) that since it is designed to protect the parolee's interest in remaining in the community it be held in the community where the alleged violation occurred. This whole concept falls flat when applied to a parolee who has fled the state and is apprehended in another state.

First, as to the community.

The community to which petitioner was paroled was California, not Arizona. Wherever in California he may have been before he absconded, his act of leaving demonstrated a rejection of his interest in remaining in that community. Technically, of course, the violation occurred when the petitioner crossed the state line—an unlikely and singularly unrealistic place in which to hold a hearing. Under any circumstances, were he to be returned to the community in which he had been residing for an in-community hearing, the time lag involved by extradition proceedings would make a prompt in-community hearing impossible. For some mysterious reason, the process of getting two governors' signatures on the necessary papers on extradition proceedings seems to involve an inordinate amount of time. Therefore, an in-community or prerevocation hearing in California is simply out of the question.

But, says the parolee, what about an in-community hearing in the asylum state? In the first place, the parolee cannot flee the state and arbitrarily establish his community in another state. In whatever state he is found he would be there unlawfully and, therefore, would have no valid interest in remaining there. It simply isn't his community as that concept is used in *Morrissey*.

Additionally, an in-community hearing in the asylum state would be completely impractical. It would necessitate the transportation to the asylum state of a parole agent, a hearing officer, probably an attorney, plus any witnesses the parolee might desire. The picture of correctional and parole officers fanning out across the nation to afford fleeing parolees their in-community or prerevocation hearings is simply absurd.

But what about a hearing conducted by the authorities in the asylum state? This would be a bit chancy. It would necessitate the somewhat rash assumption that procedures exist in the asylum state which comport with California's interpretation of *Morrissey*. One need not possess a doctorate in contemporary United States history to observe that the rulings of the Supreme Court of the United States have been received by judicial, law

enforcement and correctional authorities and the public of the various states with reactions ranging from joyful enthusiasm and wholehearted cooperation to sullen resentment and reluctant compliance. The procedures established by the asylum state which that state considers compliance with *Morrissey* might well fall far short of that considered necessary in California. Even in California the judicial and correctional reaction to *Morrissey* has been faltering and somewhat hesitant although now, two years after *Morrissey*, a fairly stable picture is beginning to emerge. Therefore, it cannot be assumed that an in-community hearing conducted by the authorities in the asylum state would comply with California's interpretation of the demands of *Morrissey*. Prudence would indicate that California authorities would have to go to the asylum state to conduct any proper hearing.

Therefore, in view of the practical problems caused by the parolee's act of leaving California, it is patently impractical, if not impossible, to afford him a prompt in-community or prerevocation hearing. Therefore, the practical place to hold a hearing would be in prison on his return.

However, this is not to say that a parolee's return to prison from outside the state is accomplished without affording him any protection.

Since *People* v. *Vickers, supra,* 8 Cal.3d 451 (see also *People* v. *Youngs,* 23 Cal.App.3d 180 [99 Cal.Rptr. 901]), there can be no question but that the Adult Authority may summarily revoke parole to avoid loss of jurisdiction by that agency—if such summary revocation is followed by a hearing conducted in conformity with constitutional requirements of due process. "Should he remain at liberty without proceedings had against him he could conceivably complete his term and the Authority would lose jurisdiction in the matter." (*Vickers, supra,* at p. 460.) This summary revocation does not in and of itself deprive the parolee of his liberty. It merely maintains jurisdiction. Thus until his liberty has been lost, the principles of *Morrissey* do not apply. However, once taken into custody, due process must be satisfied.

After the revocation of parole, the parolee is deemed an escapee and a fugitive from justice. (Pen. Code, § 3064.) As a fugitive from justice, he is subject to extradition if found in another state. Thus we turn to the nature of extradition proceedings.

Extradition proceedings are begun by a demand in writing alleging that the parolee has fled from the demanding state, accompanied by a copy of a judgment of conviction or of a sentence imposed in execution thereof,

and a statement by the executive authority of the demanding state that the parolee has violated the terms of his parole. (Uniform Criminal Extradition Act, § 3; Pen. Code, § 1548.2; see also Uniform Criminal Extradition Act, §§ 13, 23; Pen. Code, §§ 1551, 1554.2, subd. (b).)[2] On receipt of the demand for extradition, the demand must be investigated by the proper authorities. (Uniform Criminal Extradition Act, § 4; Pen. Code, § 1548.3.) Section 10 of the uniform act provides that the parolee is to be ". . . taken forthwith before a judge of a court of record in this state, who shall inform him of the demand made for his surrender and of the crime with which he is charged, and that he has the right to demand and procure legal counsel; and if the prisoner or his counsel shall state that he or they desire to test the legality of his arrest, the judge of such court of record shall fix a reasonable time to be allowed him within which to apply for a writ of habeas corpus." (See Pen. Code, § 1550.1, which is to the same effect with slight variations in language.)[3]

Thus, an extradition proceeding affords a parolee many of the due process rights guaranteed by *Morrissey*. Under *Morrissey,* a preliminary hearing must be conducted by a neutral hearing officer; the parolee must be given notice of the hearing, told of its purpose and what the charges are; the parolee may present a defense and confront witnesses; and the hearing officer must prepare a summary of the evidence and give reasons for his decision if he finds probable cause to hold the parolee. (*Morrissey, supra,* at pp. 485-487 [33 L.Ed.2d at pp. 496-498].) An extradited parolee is given notice of the charges, has a right to counsel, has a right to a full habeas corpus hearing on the issue of whether he is in fact a fugitive, and the proceedings are all conducted promptly and in the state to which he fled. At the habeas corpus hearing the state would have to produce much of the same evidence it would have to produce at an in-community or prerevocation hearing in order to have the parolee returned. It would have to prove that the person arrested was the person sought, that he was a fugitive, that there was a charge of what was a parole violation with the reasonable possibility that it might be such. (*In re Morgan,* 244 Cal.App.2d 903, 911 [53

---

[2]The Uniform Criminal Extradition Act was originally promulgated in 1926. A revised version of the act was approved by the National Conference of Commissioners on Uniform State Laws in 1936. The great majority of the states have adopted the act. Most of those, like California, adopted the revised version, and references in the text are to the act as revised in 1936. Arizona adopted the 1926 version of the act on February 24, 1937, Arizona Revised Statutes, sections 13-1301 to 13-1328. Though there are differences between the two versions, the basic procedures set forth are the same.

[3]The comparable provision in the Arizona statutes states that the parolee shall be "informed of the demand made for his surrender and of the crime with which he is

Cal.Rptr. 642].) A waiver can be made (Uniform Criminal Extradition Act, § 25-A; Pen. Code, § 1555.1), and was made in this case.[4]

It should be noted that a prerevocation hearing is only required to determine that there is probable cause to revoke a parole. The fact that a parolee is found out of the state would be prima facie proof sufficient to establish probable cause to revoke his parole. If he has justification or an excuse for being absent from the State of California, this would only be relevant to the issue of mitigation of the charges and the ultimate disposition of his case at the revocation hearing.

Admittedly, at an extradition proceeding, there would be no hearing on the guilt or innocence of the parolee as to the parole violation charged. Thus, the extradition hearing cannot be equated with a true in-community or prerevocation hearing under *Morrissey*. Nevertheless, in light of the protections granted to those who are to be extradited and because of the complex legal and technical problems involved in attempting to hold a prerevocation hearing in either this or the asylum state, we conclude that extradition hearings are a suitable substitute for prerevocation or in-community hearings and that extradition hearings or a waiver thereof, coupled with a prompt revocation hearing in prison, comports with the principles of due process mandated in *Morrissey*.

We now turn to the revocation or in-prison hearing in this case. Other than the issue of timeliness, no contention is made that this hearing does not otherwise satisfy *Morrissey*. Therefore, we discuss only the issue of the timeliness of that hearing.

It is to be remembered that the petitioner waited for five months before he filed his petition for writ of habeas corpus. His revocation hearing was had within a month and at that hearing he admitted the charge.

At the habeas corpus hearing, the court took no evidence and made no finding on the subject of any prejudice the defendant might have suffered

---

charged, and that he has the right to demand legal counsel; and if the prisoner, his friends, or counsel shall state that he or they desire to test the legality of his arrest, the prisoner shall be taken forthwith before a judge of a court of record, who shall fix a reasonable time to be allowed him within which to apply for a writ of habeas corpus."

[4]The original version of the act did not explicitly provide for a waiver, and hence the Arizona statutes do not contain a provision comparable to section 25-A of the act as revised in 1936. However, it is apparent from what happened in this case that waiver is an accepted practice in Arizona.

by reason of the lapse of time. The court apparently felt that the six months' delay, standing by itself, was a violation of *Morrissey*. Unfortunately, the court did not have the advantage of the thinking of our Supreme Court on this subject as set forth in *In re La Croix, supra,* 12 Cal.3d 146, handed down some eight months after the hearing in this case.

In *La Croix,* there was a delay of more than six months between the arrest and revocation and a delay of almost four months between the request for hearing and compliance with *Morrissey*. The court said: "The denial of petitioner's right to a timely prerevocation hearing notwithstanding his timely effort to assert it does not necessarily mean that he is automatically entitled to relief therefrom. Due process does not require that a parolee benefit from such a denial, but only that no unfairness result therefrom. Accordingly, in the absence of evidence that the Authority is not making a good faith effort to comply with the mandates of *Morrissey* and our decisions in this respect, a parolee whose parole has been revoked after a properly conducted revocation hearing is not entitled to have the revocation set aside unless it appears that the failure to accord him a prerevocation hearing resulted in prejudice to him at the revocation hearing. [Fn. omitted.]" (*In re La Croix, supra,* 12 Cal.3d 146, 154.)

In this case there is no showing of any bad faith on the part of the Adult Authority. Rather, everyone seemed to agree that the petitioner had merely been misplaced or forgotten, a not startling situation when one considers the size and complexity of the California prison system with hundreds of inmates being received, released or transferred each week. The petitioner slept on his rights for five months then when he brought his plight to the attention of the authorities, he received a prompt hearing. Thus, since there is no finding of prejudice to the petitioner, he's not entitled to have the revocation set aside.

In addition, the failure of the petitioner to take effective action to preserve his right to a timely revocation hearing is deemed a consent to the delay of which he now complains. We again quote *La Croix:* "The fundamental right to a timely revocation hearing cannot be denied. That right, however, is no more fundamental than the constitutional right to a speedy trial. [Citations.] Such latter right, however, is deemed waived where an accused fails to object to a trial set beyond what otherwise may have been a reasonable period of time after the bringing of criminal charges. The failure to object in such a case presumes consent. [Citations.] When a parolee charged with parole violations intends to preserve his right to a determination on the merits within the limits of 'reasonable time' as delineated in *Morrissey* he, like an accused charged with a crime, cannot sit idly by and

be heard to complain only after proceedings have been concluded adversely as to him. Certainly he cannot be accorded greater protection in preserving his conditional liberty than an accused charged with the commission of a criminal offense. [Citation.] In the absence of a record that petitioner took affirmative action to preserve his right to a timely revocation hearing, he is deemed to have consented to the delay of which he now complains. He is thus entitled to no relief." (*In re La Croix, supra,* 12 Cal.3d 146, 156-157.) Thus, in the instant case, since the petitioner took no affirmative action to preserve his right to a timely revocation hearing, he is deemed to have consented to the delay of which he now complains.

Order granting petitioner's writ of habeas corpus reversed.[5]

Kerrigan, J., and Kaufman, J., concurred.

---

[5]The suggestion has been made that this matter be returned to the trial court for a consideration of the issue of prejudice. Certain pragmatic considerations militate against this action. Petitioner has now been paroled. It would be an unconscionable waste of time of everyone—the petitioner (who has returned to his normal pursuits and, hopefully some kind of steady employment, assuming he has not skipped again), the trial court, the district attorney, the Attorney General, the Adult Authority and this court should another appeal ensue. We feel that everyone involved could make more productive use of his time than debating the possibility of prejudice in the life of Edward M. Morales by the unexplained delay of five months in prison. The idea of such a hearing in this case smacks too much of the alleged practice of medieval monks sitting around their cells endlessly debating how many angels could sit on the head of a pin.